*In the Matter of Smart Energy Holdings, LLC D/B/A SmartEnergy*, No. 1, September Term, 2023, Opinion by Booth, J.

**Public Utilities – Administrative Law – The Electric Customer Choice Act of 1999 – – The Maryland Telephone Solicitations Act**

Under the Maryland Electric Customer Choice and Competition Act of 1999, Md. Code Ann., Public Utilities Article ("PU") § 7-501, *et seq.* (2020 Repl. Vol., 2023 Supp.) (the "Choice Act"), the Maryland General Assembly granted significant regulatory authority and oversight to the Public Service Commission ("Commission") to ensure that electricity suppliers who sell electricity in Maryland comply with applicable laws designed to protect consumers, including the State's consumer protection laws.

SmartEnergy Holdings, LLC ("SmartEnergy") is a retail electricity supplier that obtained a license from the Commission to sell electricity in Maryland in 2017. After numerous consumer complaints, the Commission Staff filed a complaint against SmartEnergy alleging violations of various provisions of Maryland law governing retail electricity suppliers. The Commission delegated the case to a public utility law judge ("PULJ"), who issued findings of fact and a proposed order. The PULJ found that SmartEnergy engaged in deceptive, misleading, and unfair trade practices, and a pattern or practice of systematic violations of the Choice Act and the Commission's regulations.

On appeal, the Commission affirmed the factual findings of the PULJ and determined that the Maryland Telephone Solicitations Act, Md. Code Ann., Commercial Law Article ("CL") § 14-2201, *et seq.* (2013 Repl., Vol., 2023 Supp.) ("MTSA") applied to SmartEnergy's marketing and sales practices. The Commission found that SmartEnergy violated the MTSA.

As a result of these violations, the Commission: (1) imposed a moratorium prohibiting SmartEnergy from enrolling or soliciting additional customers in Maryland and (2) directed SmartEnergy to take certain actions, including returning all of its Maryland customers to their utility's standard offer service, and refunding to its former and existing customers the price difference between SmartEnergy's electricity rate and the utility's standard offer service during the period of the customer's enrollment.

SmartEnergy filed a petition for judicial review in the Circuit Court for Montgomery County, and the circuit court affirmed the Commission's decision. Thereafter, SmartEnergy appealed to the Appellate Court of Maryland, which affirmed the circuit court's judgment. The Supreme Court of Maryland granted SmartEnergy's petition for writ of *certiorari*.

The Supreme Court of Maryland held that:

1. Under the plain language of the Choice Act, the General Assembly granted the Commission the express authority to determine whether electricity suppliers under its jurisdiction have violated Maryland's consumer protection laws, including the MTSA, and to impose statutory remedies and civil penalties when it determines that the supplier has violated any applicable consumer protection laws of this State.

2. The Commission correctly concluded that the MTSA applied to SmartEnergy's marketing and sales practices that are the subject of this proceeding. The MTSA applies to sales made over the telephone where the consumer places the telephone call to the merchant in response to a merchant's marketing materials unless the transaction falls within one of the statutory exemptions outlined in CL § 14-2202.

3. The Commission's affirmance of the PULJ's findings of fact that SmartEnergy's business practices violated the Choice Act and the Commission's regulations, and its additional findings of fact that SmartEnergy's business practices violated the MTSA, were supported by substantial evidence in the record.

4. The remedies imposed by the Commission in its final order arising from SmartEnergy's violation of Maryland laws were within its discretion and were not arbitrary or capricious.

Circuit Court for Montgomery County
Case No.: 485338V
Argued: September 7, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 1

September Term, 2023

IN THE MATTER OF SMART ENERGY
HOLDINGS, LLC D/B/A SMARTENERGY

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

Opinion by Booth, J.
Gould, J., concurs and dissents.

Filed: February 22, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In 1999, the electricity supply market in Maryland underwent a sea change. With the enactment of the Electric Customer Choice and Competition Act of 1999 (the "Choice Act"),[1] the General Assembly deregulated the electric industry in Maryland. Prior to the enactment of the Choice Act, electric energy supply and electric energy distribution were bundled together and were exclusively provided by one electric utility company to customers within the distribution territory for that company. The legislative purposes of the Choice Act included establishing "customer choice of electricity supply" and creating "competitive retail electricity supply and electricity supply services markets."[2] In furtherance of these goals, the Choice Act requires that the component parts of the electric service be unbundled. Although distribution would remain monopolized, the Legislature intended that electricity supply rates would be largely established by the open market.

Since the enactment of the Choice Act, a Maryland consumer may shop on the open market for a third-party retail energy supplier. For example, if a residential consumer who resides in a Baltimore Gas and Electric Company ("BGE") distribution territory wishes to purchase electricity from a third-party retail energy supplier, the customer may do so. In such a case, the consumer will receive a monthly invoice from BGE, as the utility company responsible for distribution services in the territory, that includes the electricity rate charged by the retail electricity supplier.

---

[1] Md. Code Ann., Public Utilities Article ("PU") § 7-501, *et seq.* (2020 Repl. Vol., 2023 Supp.).

[2] PU § 7-504(1), (2).

Recognizing that not all Maryland consumers will shop for their electricity supplier, the Choice Act also requires electric utility companies to provide "backstop" electricity supply, known as the "standard offer service" or "SOS" to consumers who do not shop for their electricity supply on the open market.[3] In other words, although the consumer may select an electricity supplier that is different from the consumer's local utility company providing electricity distribution service, the consumer is not required to choose an electricity supplier and may pay the standard offer service to the distribution company.

As a condition to selling electricity in Maryland, the Choice Act requires that an electricity supplier hold a license that is issued by the Maryland Public Service Commission ("Commission").[4] As we will discuss in more detail herein, the General Assembly has granted significant regulatory authority and oversight to the Commission to ensure that electricity suppliers who sell electricity in Maryland comply with applicable laws designed to protect consumers, including the State's consumer protection laws.

In this case, we are asked to consider whether the Commission correctly determined that the marketing and sales practices of an electricity supplier, SmartEnergy Holdings, LLC ("SmartEnergy")—which obtained a license from the Commission to sell electricity in Maryland in February 2017—violate Maryland laws and regulations designed to protect Maryland consumers from unfair, false, misleading, or deceptive trade practices. In March 2021, the Commission issued a decision and order concluding that SmartEnergy's

---

[3] PU §§ 7-506(e), 7-510(c).

[4] PU § 7-507.

2

marketing and sales practices in Maryland violated the Choice Act, the Maryland Telephone Solicitations Act,[5] and regulations promulgated by the Commission. As a result of these violations, the Commission: (1) imposed a moratorium prohibiting SmartEnergy from enrolling or soliciting additional customers in Maryland and (2) directed SmartEnergy to take certain actions, including returning all of its Maryland customers to the customer's utility's standard offer service, and refunding to its former and existing customers the price difference between SmartEnergy's electricity rate and the utility's standard offer service during the period of the customer's enrollment.

The legal issues raised by SmartEnergy in this matter arise under two statutory schemes—Maryland's consumer protection laws that are set forth in Titles 13 and 14 of the Commercial Law Article, and Maryland's public utilities laws that are applicable to energy suppliers, which are set forth in Title 7 of the Public Utilities Article. Before turning to the parties' specific contentions at issue, it is useful to provide an overview of the statutory schemes and their interrelationships.

**I**

**Statutory and Regulatory Framework**

*A. The Maryland Consumer Protection Act ("MCPA")*

The Maryland Consumer Protection Act ("MCPA") is set forth in the Commercial Law Article of the Maryland Code, ("CL") § 13-101 *et seq.* (1974, 2013 Repl. Vol., 2021 Supp.). The purpose of the MCPA is to "set certain minimum statewide standards for the

---

[5] Md. Code Ann., Commercial Law Article ("CL") § 14-2201, *et seq.* (2013 Repl. Vol., 2023 Supp.).

protection of consumers across the State." CL § 13-102(b)(1). In enacting the MCPA, the General Assembly determined that the State "should take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." *Id.* § 13-102(b)(3). The General Assembly further instructed that the MCPA shall be "construed and applied liberally to promote its purpose." *Id.* § 13-105. To that end, the MCPA generally prohibits unfair, abusive, or deceptive trade practices, *id.* § 13-303, and also contains a nonexclusive list of such practices, which includes making any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the *capacity, tendency, or effect* of deceiving or misleading consumers[,]" *id.* § 13-301(1) (emphasis added). Also included within the definition of "unfair, abusive, or deceptive trade practices" is a violation of the Maryland Telephone Solicitations Act ("MTSA"), set forth in Title 14, Subtitle 22 of the Commercial Law Article. *Id.* § 13-301(14)(xiv).

The MCPA includes public enforcement mechanisms and private remedies. Specifically, CL § 13-201 establishes the Division of Consumer Protection in the Office of the Attorney General ("Division") and charges it with the duty to administer the MCPA. Notably, "[t]he Division has the power and the duty to receive and investigate complaints and to initiate an investigation of any unfair and deceptive trade practice." *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 149 (2005) (citing CL § 13-204). The General Assembly has also conferred rule-making authority on the Division, including the authority to adopt reasonable "rules, regulations, or standards which further define specific unfair or

4

deceptive trade practices." CL § 13-205(a)(1). Although the Division is the primary agency charged with enforcing the MCPA, the statute also confers concurrent enforcement authority on other State agencies. *See id.* § 13-103(c) (stating that "[t]he provisions of this title shall be enforced by each agency of the State within the scope of its authority").

### B. The Maryland Telephone Solicitations Act ("MTSA")

The General Assembly enacted the Maryland Telephone Solicitations Act ("MTSA") in 1988. 1988 Md. Laws, ch. 588. According to the purpose paragraph of the legislation, it was enacted:

> FOR the purpose of requiring that certain contracts solicited by telephone be reduced to writing in order to be enforceable; prohibiting certain actions by merchants regarding telephone solicitation; requiring that a contract made pursuant to a telephone solicitation meet certain conditions; providing that a violation of this Act shall be an unfair and deceptive trade practice; providing for the applicability of this Act; defining certain terms; and generally relating to telephone solicitations.

The MTSA, codified at Title 14, Subtitle 22 of the Commercial Law Article, is a consumer protection statute that applies to contracts arising from "telephone solicitations" as defined by the Act. If a contract for the sale of consumer goods, consumer services, or consumer realty[6] is made pursuant to a "telephone solicitation," it "is not valid and enforceable against a consumer"[7] unless it complies with the provisions of the MTSA. The provisions

---

[6] "'Consumer goods', 'consumer realty', and 'consumer services' mean, respectively, goods, real property, and services which are primarily for personal, household, family, or agricultural purposes." CL § 14-2201(c). The definitions of these terms under the MTSA are identical to the terms as they are defined in the MCPA. *See id.* § 13-101(d).

[7] "'Consumer' means an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, or consumer realty." CL § 14-2201(b).

5

require, among other things, that a contract "be reduced to writing and signed by the consumer." CL § 14-2203(b)(1).[8] "A merchant engaging in a telephone solicitation may not make or submit any charge to the consumer's credit account until after the merchant receives from the consumer a copy of the contract which complies with" the MTSA. *Id.* § 14-2204. In addition to any remedies otherwise available at law, a violation of the MTSA constitutes an unfair or deceptive trade practice under the MCPA. *Id.* § 14-2205(1).

Under the MTSA, "'[t]elephone solicitation' means the attempt by a merchant to sell or lease consumer goods, services, or realty to a consumer located in this State that is: (1) Made entirely by telephone; and (2) Initiated by the merchant." *Id.* § 14-2201(f). The parties dispute whether SmartEnergy's marketing and business practices—consisting of

---

[8] CL § 14-2203 states:

(a) A contract made pursuant to a telephone solicitation is not valid and enforceable against a consumer unless made in compliance with this subtitle.

(b) A contract made pursuant to a telephone solicitation:
    (1) Shall be reduced to writing and signed by the consumer;
    (2) Shall comply with all other applicable laws and regulations;
    (3) Shall match the description of goods or services as that principally used in the telephone solicitation;
    (4) Shall contain the name, address, and telephone number of the seller, the total price of the contract, and a detailed description of the goods or services being sold;
    (5) Shall contain, in at least 12 point type, immediately preceding the signature, the following statement:
        "You are not obligated to pay any money unless you sign this contract and return it to the seller."; and
    (6) May not exclude from its terms any oral or written representations made by the merchant to the consumer in connection with the transaction.

SmartEnergy mailing postcards to prospective consumers stating that they are eligible for a free month of electricity and providing a toll-free telephone number, which sets in motion a telephone call from the customer to SmartEnergy, during which SmartEnergy attempts to sell electricity to the customer—fall within the statutory definition of "telephone solicitation." We will discuss the parties' competing statutory interpretations *infra.*

### C. The Choice Act and Other Relevant Provisions of the Public Utilities Article

The Commission was established in 1910 for the purpose of regulating public utilities and transportation companies conducting business in Maryland. *See* 1910 Md. Laws, ch. 180. An independent unit of the executive branch of State government, the Commission has jurisdiction over each public service company that engages in or operates a utility business in the State "to the full extent that the Constitution and laws of the United States allow[.]" Md. Code Ann., Public Utilities Article ("PU") §§ 2-101, 2-112(a) (2020 Repl. Vol., 2023 Supp). "The Commission has the powers specifically conferred by law[,]" as well as "the implied and incidental powers needed or proper to carry out its functions under" the applicable provisions of the Maryland Code. *Id.* § 2-112(b). The General Assembly instructs that "[t]he powers of the Commission shall be construed liberally." *Id.* § 2-112(c).

When the General Assembly enacted the Choice Act, it granted the Commission regulatory oversight over third-party retail energy suppliers. *Id.* § 7-507. This regulatory authority extends not only to requirements related to licensure and financial integrity, *see id.* § 7-507(a)–(c), but also to ensuring that electricity suppliers comply with the State's consumer protection laws. The Choice Act expressly states that "[a]n electricity supplier

7

may not engage in marketing, advertising, or trade practices that are unfair, false, misleading, or deceptive." *Id.* § 7-505(b)(7). The General Assembly granted the Commission the power to adopt regulations: (1) to protect consumers from "anticompetitive and abusive practices;" (2) requiring electricity providers to provide "adequate and accurate customer information to enable customers to make informed choices regarding the purchase of any electricity services offered by the electricity supplier;" (3) establishing "reasonable restrictions on telemarketing;" (4) establishing "procedures for contracting with customers;" (5) establishing "requirements and limitations relating to deposits, billing, collections, and contract cancellations;" (6) establishing "provisions providing for the referral of a delinquent account by an electricity supplier to the standard offer service" required to be provided by the consumer's electric company under the subtitle; and (7) establishing "procedures for dispute resolution." *Id.* § 7-507(e). The Choice Act requires that the Commission "consult with the Consumer Protection Division of the Office of the Attorney General before issuing regulations designed to protect consumers." *Id.* § 7-507(o).

In tandem with its licensing and regulatory authority, the General Assembly has given enforcement responsibility to the Commission. PU § 7-507(k)(1) states:

> The Commission may revoke or suspend the license of an electricity supplier, impose a civil penalty or other remedy, order a refund or credit to a customer, or impose a moratorium on adding or soliciting additional customers by the electricity supplier, for just cause on the Commission's own investigation or on complaint of the Office of People's Counsel, the Attorney General, or an affected party.

8

"Just cause" is defined by statute to include: (1) "switching or causing to be switched, the electricity supply for a customer without first obtaining the customer's permission;" (2) "committing fraud or engaging in deceptive practices;" and (3) "violating a provision of the [Public Utilities Article] or any other applicable consumer protection law of the State[.]" *See id.* § 7-507(k)(3)(ii), (iv), and (viii). The General Assembly granted the Commission discretionary authority to determine the amount of any civil penalties for a violation of § 7-507 after notice and a hearing, and after considering certain statutorily enumerated factors. *Id.* § 7-507(l)(1)(i).[9] The Commission also has the authority to revoke or suspend an electricity supplier's license, *id.* § 7-507(l)(1)(ii), and "may order the electricity supplier to cease adding or soliciting additional customers or to cease serving customers in the State." *Id.* § 7-507(n).

---

[9] PU § 7-507(l) states:

    (1) An electricity supplier or person selling or offering to sell electricity in the State in violation of this section, after notice and an opportunity for a hearing, is subject to:
       (i)     a civil penalty of not more than $10,000 for the violation; or
       (ii)    license revocation or suspension.

    (2) Each day a violation continues is a separate violation.

    (3) The Commission shall determine the amount of any civil penalty after considering:
       (i)     the number of previous violations of any provisions of this division;
       (ii)    the gravity of the current violation; and
       (iii)   the good faith of the electricity supplier or person charged in attempting to achieve compliance after notification of the violation.

9

Finally, it is worth noting that the General Assembly recognized that its consumer protection directives set forth in Subtitle 5 of Title 7 of the Public Utilities Article would overlap with the consumer protection statutes set forth in the Commercial Law Article. Accordingly, PU § 7-507(q) expressly states that "[n]othing in this subtitle may be construed to affect the authority of the Division of Consumer Protection in the Office of the Attorney General to enforce violations of Titles 13 and 14 of the Commercial Law Article or any other applicable State law or regulation in connection with the activities of electricity suppliers."

### D. *Pertinent Regulations Promulgated by the Commission*

Consistent with the authority granted by statute, the Commission has promulgated regulations that are set forth in Title 20, Subtitle 53 of the Code of Maryland Regulations ("COMAR"), which apply to electric utilities and suppliers who serve residential customers. Pertinent to SmartEnergy's contentions in this case, the Commission's regulations prohibit a supplier from engaging "in a marketing or trade practice that is unfair, false, misleading, or deceptive." COMAR 20.53.07.07A(2). Concerning telephone solicitation specifically, the regulations state that "[a] supplier soliciting customers by telephone shall comply with all applicable State and federal law, including the [MTSA.]" *Id.* 20.53.07.07D(1). The regulations specify the minimum requirements that must be included in an energy supplier's contract with a customer. *Id.* 20.53.07.08A. In addition to providing a contract, the regulations also require that the electricity supplier provide a

10

contract summary on a form provided by the Commission.  *Id.* 20.53.07.08B.[10]  We will

address additional regulations as we consider the parties' contentions herein.

## II

## Factual Background and Procedural History

SmartEnergy is an electricity supplier with its principal offices located in New York.

SmartEnergy sells 100% renewable energy.[11]  In February 2017, the Commission issued

SmartEnergy a Maryland electricity supplier license.  Thereafter, SmartEnergy

commenced marketing efforts to solicit customers and enrolled Maryland consumers in

electricity contracts that were consummated during telephone calls between the consumer

and SmartEnergy's agents.[12]  These marketing efforts, and the contracts that SmartEnergy

---

[10] COMAR 20.53.07.08B states, in pertinent part:

(1) At the time of completion of the contracting process, a supplier shall provide the customer a copy of the executed contract and completed Contract Summary on the form provided by the Commission.

(2) If the contract is completed through telephone solicitation, the supplier shall send the Contract Summary to the customer along with the contract that must be signed by the customer and returned as required by the Maryland Telephone Solicitations Act.  If the contract is exempt from the Maryland Telephone Solicitations Act, the supplier shall send the Contract Summary with the contract to the customer.

[11] According to SmartEnergy's website, it purchases "renewable energy credits (RECs) to offset 100% of [a customer's] electricity usage[.]"  https://perma.cc/W9HD-455A.

[12] SmartEnergy is licensed to provide electricity and electricity supply services to residential, commercial, and industrial customers in the distribution territories of Baltimore Gas and Electric ("BGE"), Potomac Electric Power Company ("PEPCO"), Delmarva Light and Power Company, Southern Maryland Electric Cooperative, Inc., and Choptank Electric Cooperative, Inc.

entered into with Maryland consumers during telephone calls, are at the center of this administrative proceeding.

### A. *SmartEnergy's Postcard Mailings and Telephone Contracts*

From February 2017 through May 2019, SmartEnergy mailed six million postcards to Marylanders advertising its services. The postcards informed consumers that they were "eligible" for a "free month of electricity" and a six-month guaranteed rate protection plan. They also provided a toll-free number inviting prospective customers to call to learn more about the offer and made multiple references to the consumer's existing utility company. The administrative record in this case includes many examples of the types of postcards that SmartEnergy sent to prospective Maryland customers during this period, which contain substantially the same content. For purposes of our discussion, we will focus on one postcard that SmartEnergy mailed to prospective customers within BGE's distribution territory as an example.

The front and back of the postcard included six references to BGE—the customer's utility company. The left-hand corner of the postcard (in a similar location to where a return address would appear) contained the words "SmartEnergy for BGE customers." The postcard indicated that the eligibility for the free month of electricity is linked to the customer's status with BGE, stating:

> Because you are a [city] resident and a BGE customer, you are eligible to receive a **free month of electricity**. In addition to free electricity supply on your BGE bill, you are also eligible to receive 6 months guaranteed rate protection. Call us today to claim this benefit.

12

The postcard stated that the offer was "time sensitive" and indicated that the prospective customer should respond by a certain date to receive the offer. In smaller print at the bottom of the postcard, SmartEnergy informed the customer that, to receive the free month of electricity, the customer must "select SmartEnergy," SmartEnergy "is not affiliated with BGE[,]" the offer "[a]pplied to electricity supply only[,]" and "[d]elivery, taxes and other BGE fees are not included." A license number was provided.[13] Curiously, although SmartEnergy sells 100% renewable energy, that fact was omitted from its postcards.

During this time period, SmartEnergy received approximately 104,000 calls from prospective customers who received the postcards. Each call was recorded by SmartEnergy, and SmartEnergy agents were directed to follow a script. The initial focus of the telephone call was the promotional one month of free electricity. Under the script, the SmartEnergy agent first greeted the customer, informed the customer that the agent was with SmartEnergy and "congratulated" the customer on the free month of electricity. The agent then stated that, in addition to the free month of electricity, the customer also qualified for a promotional "price protection" and advised them that their rate would remain the same for six months. The agent also suggested that the fixed rate would provide more security compared to variable utility rates during high usage periods.

---

[13] Between February 2017 and July 2018, SmartEnergy's postcards did not contain SmartEnergy's license number. As a result of a complaint-based investigation by the Commission's Consumer Affairs Division ("CAD") into SmartEnergy's marketing practices, SmartEnergy added its license number to subsequent mailings beginning in July 2018. The adequacy of the subsequent remedial inclusion of the license number is discussed *infra*.

The script contained statements that "all" of the customer's services from the utility would "remain the same" and that, if the customer opted for SmartEnergy's services, the only difference would be that the price that the consumer paid for electricity would be protected. The agent then stated that they wanted to make sure the price protection was applied to the correct account. At that point, the agent requested information from the electric choice ID that appeared on the customer's existing utility bill and confirmation of the account holder status. Once the SmartEnergy agent believed the customer had agreed to the promotion being offered, the agent proceeded to the confirmation questions portion of the script. The script required the agent to say, "[n]ow I just need to ask you two quick questions to confirm the information we've discussed." In many instances, however, the information that was included up to that point in the telephone solicitation was not previously discussed, and instead, was being mentioned for the first time. In an attempt to obtain affirmative confirmation on the part of the customer as to all the terms and conditions of the contract, the agent read a statement with several pieces of information, and then the customer was asked if they understood their right to cancel.[14]

---

[14] The following are the confirmation questions from the script:

Confirmation question #1: [customer], do you understand that by enrolling in SmartEnergy's Price Protection Plan, you'll receive a fixed rate of [insert rate] for 6 months and then a competitive market-based rate that may change from month-to-month, and as mentioned, [insert utility company] will continue to deliver your electricity, send your bill, and respond to emergencies?

. . . .

Of the approximately 104,000 calls from prospective customers during the relevant period, approximately 32,000 callers enrolled as customers with SmartEnergy. SmartEnergy did not provide written contracts or contract summaries to those customers who enrolled. In some instances,[15] SmartEnergy sent customers a Welcome Kit, which contained a letter stating:

> Welcome and congratulations for choosing SmartEnergy.
>
> We want to remind you of the key benefits of your plan, and make sure you understand what to expect. At SmartEnergy we will strive to provide you with the lowest possible rate, cleaner electricity, and the same reliable service.
>
> You have selected our 6 month fixed product with a fixed price of [___] cents per kilowatt hour. Your electricity rate will appear on the supply portion of your bill. Your agreement and other materials are enclosed.
>
> Here's what to expect:
>
> [Insert utility company] will still deliver your electricity, read your meter and respond to emergencies just like they always have. Your choice of SmartEnergy will be processed by [insert utility company] within one or two billing cycles.
>
> After that, you will see SmartEnergy listed in the electricity supply portion of your [insert utility] bill. You'll continue to receive one bill and make one payment to [insert utility] every month. Nothing else will change.

---

> Confirmation question #2: SmartEnergy will send you a Welcome Kit confirming everything we have discussed today, and [insert utility company] will send you a letter confirming that you have selected SmartEnergy. When you receive the SmartEnergy Welcome Kit, you'll be able to review all of the terms of your agreement and if you change your mind you can cancel and return to [insert utility company] standard rate at any time. Do you understand your right to cancel?

[15] Of the 34 CAD complaints, SmartEnergy produced copies of the Welcome Kits for only 25 customers.

The Welcome Kit also included a "Free Month Redemption Form"—or a rebate form—with instructions to the customer, stating that "[a]fter your 6 months of price protection, just mail this form along with a copy of your 7th electricity bill that has SmartEnergy listed as your supplier."

### B. *The Commission Staff's Investigation and Administrative Proceedings*

The Commission's Consumer Affairs Division ("CAD")[16] received 34 customer complaints regarding SmartEnergy during the period in which SmartEnergy was engaging in its marketing efforts and telephone sales in Maryland. The bases of these complaints included that: the customer's electricity supply was switched without their authorization; SmartEnergy portrayed itself as being affiliated with the customer's then-current electricity provider; the bills were excessive; and the customers were unable to cancel their service.[17]

---

[16] CAD was established by the Commission with the authority to review and investigate inquiries referred by the Commission, its staff, or a customer. *See* COMAR Chapter 20, Subtitle 32. The regulations governing CAD's review and investigation of disputes are set forth in COMAR 20.32.01.04.

[17] For example, one CAD complaint alleged: "I thought I was speaking to BGE. I wasn't. It was someone from SmartEnergy and not affiliated with BGE. I was caught in a SCAM and didn't realize it at the time. [] I called [] to cancel this offer. I was put on hold for 11 minutes and instructed to leave a message and my call would be returned asap."

In another complaint, a customer disputed that he enrolled with SmartEnergy during the telephone call, stating, "Nothing could be further from the truth! The reason [for] my call was to inquire about an ad for a full month for free electricity, and I thought I was talking with an employee of BGE, [who] could make such an offer."

Another complaint stated that "I am a customer of BGE. I was contacted by SmartEnergy portraying themselves as a subsidiary of BGE," and after learning that the account had been switched, stated that "I was deceived, that [S]martEnergy portrayed themselves as a unit of BGE."

After receiving numerous customer complaints, the Commission Staff filed a complaint on May 10, 2019, alleging violations of various provisions of Maryland law governing retail electricity suppliers. The Commission granted the Staff's request for a show cause order, docketed the matter, and delegated the case to the Public Utility Law Judge ("PULJ") Division for investigation, finding that there were genuine issues of material fact that warranted further proceedings.[18] Thereafter, the Commission Staff filed two amended complaints, and the Office of People's Counsel ("OPC")[19] filed a complaint,

---

Another individual notified CAD that "Smart Energy switched my 95 year old mother-in-law from Constellation to their company as her electric supplier without her permission. She had called them about a 'free month' postcard offer Smart Energy had mailed to her. We called and switched her back. We also asked Smart Energy for a copy of the phone transcript (or recording). They indicated they would call me in 48 hours with the recording. They did not."

Many customers noted in their complaints that their utility company advised them to contact the CAD because "it sounded as if it was a scam," and to prevent future misinformation from being distributed by SmartEnergy.

[18] Pursuant to PU § 3-104(d)(1), the Commission has the authority to delegate to a public utility law judge ("PULJ") "the authority to conduct a proceeding that is within the Commission's jurisdiction." Thereafter, the PULJ has the authority to conduct a hearing and issue a proposed order and findings of fact. *Id.* § 3-104(d)(2). We discuss the parties' right to appeal to the Commission in note 24 *infra.*

[19] The People's Counsel—a position created by the General Assembly—is an attorney licensed in Maryland who is appointed by the Attorney General with the advice and consent of the Senate. PU § 2-202. The duties of the Office of People's Counsel ("OPC") include evaluating "each matter pending before the Commission to determine if the interests of residential and noncommercial users are affected." *Id.* § 2-204(a)(1)(i). If the OPC "considers the interest of residential and noncommercial users to be affected, [it] shall appear before the Commission and courts on behalf of residential and noncommercial users in each matter or proceeding over which the Commission has original jurisdiction[.]" *Id.* § 2-204(a)(2).

17

alleging, among other things, the enrollment of customers without written contracts and without providing contract summaries, false and misleading advertising, and failure to provide customers with pricing information.

### 1. PULJ's Findings and Recommended Order

Following discovery, on September 11, 2020, the PULJ granted partial summary judgment against SmartEnergy for failing to provide its customers with a contract summary at the time of the completion of the contract process for the period between February 2017 until the Commission Staff filed its complaint in May 2019, in violation of the Commission's regulations.[20] The record before the PULJ included the testimony of multiple witnesses.

The OPC filed the testimony of Susan Baldwin and Harold Muncy. Ms. Baldwin, a specialist in economics, regulation, and public policy of utilities, testified that she had reviewed all of the filings and supporting exhibits. She described the manner in which she believed SmartEnergy's business practices were misleading, deceptive, and filled with incomplete information. She testified about the various ways in which she determined that SmartEnergy's postcards and script were misleading or had the capacity or tendency to mislead, which she further testified was confirmed by the customer complaints and audio recordings. Mr. Muncy testified as to what utility electric supply rate information would have been available on the dates on which the consumers who filed complaints had enrolled

---

[20] *See* COMAR 20.53.07.08B(1) requiring that, at the time of the completion of the contracting process, the supplier provide the customer with a copy of a "completed Contract Summary on the form provided by the Commission."

with SmartEnergy.  He specifically testified regarding the comparison between the SmartEnergy rates and other utility rates.

The Commission Staff filed the testimony of Kevin Mosier.  Mr. Mosier testified that, based upon a review of the complaints and associated audio recordings, SmartEnergy engaged in a pattern and practice of systemic violations of Maryland consumer protection laws.  Mr. Mosier discussed telemarketing calls in the record, which contained false implications that customers' rates would not increase, deliberately obscured information that customers would be switching to a competitive supplier, and misled customers into believing that their current supplier rates would increase if they did not switch.

SmartEnergy's filed written testimony included that of its Chief Customer Officer, Dehan Besnayake; Chief Executive Officer, Daniel Kern; and Chief Compliance Officer, Anne Marie Toss.  Mr. Besnayake testified regarding SmartEnergy's quality assurance process and the procedure for addressing cancellation requests.  He indicated that SmartEnergy transitioned to a "more formalized and standardized approach" in 2019.

Mr. Kern testified concerning SmartEnergy's process for cancellation requests.  He testified that the agent would ask for the cancellation reason and attempt to retain the customer but would still go forward with processing the cancellation if the agent was unable to retain the customer.  He stated that all cancellation requests cited by the Commission were in fact timely processed.

Mr. Kern further testified that SmartEnergy did not engage in outbound telephone sales, but rather, it only received calls from potential customers—which he contended resulted in SmartEnergy's business practices being excluded from the application of the

19

MTSA. He also disputed the contention that the postcards were misleading, arguing that all the required information for a general marketing advertisement was included on the postcards, and that there was no rule regarding particular postcard formatting. Additionally, Mr. Kern testified that SmartEnergy disclosed all material terms and had relatively few complaints. Mr. Kern disagreed that SmartEnergy engaged in a "systemic practice" of deception and misrepresentation.

Ms. Toss testified that, in her experience as Chief Compliance Officer, SmartEnergy complied with Maryland consumer protection laws. She described the process for handling complaints that originated with the Commission, including launching an investigation to determine whether a violation occurred. Ms. Toss further testified that SmartEnergy took steps to ensure compliance with Maryland laws, including, beginning in June 2019, by sending contract summaries, as well as prior to June 2019, by sending explanatory letters to enrolled customers stating that SmartEnergy is an independent supplier.

After an evidentiary hearing in October 2020, the PULJ issued a 28-page proposed order with detailed findings of fact and recommendations concerning a remedy and penalty. First, the PULJ found that the MTSA did not apply to SmartEnergy's business practices because "the solicitations began with something other than a phone call to the consumer from SmartEnergy[.]" After concluding that the MTSA did not apply, the PULJ nonetheless found that SmartEnergy "engaged in deceptive trade practices as part of its operations in Maryland" and "engaged in a pattern or practice of systemic violations of the consumer protections" that are prohibited by the Choice Act and the Commission's regulations promulgated in accordance with its regulatory authority under the Choice Act.

20

The PULJ made her findings based upon the testimony and exhibits, which included SmartEnergy's mailing materials, SmartEnergy's telephone script that was used in connection with the telephone transactions, customer complaints in connection with the CAD complaints, and audio recordings of the telephone transactions that were the subject of the CAD complaints.

### a. Findings Related to Mailing Materials

With respect to the mailing materials, the PULJ determined that they did not contain SmartEnergy's license number from February 2017 through July 2018 in violation of the applicable Choice Act regulations.[21]

### b. Findings Related to the Telephone Script

Concerning SmartEnergy's telephone script that its agents used to make the telephone sales, the PULJ found that the script had the "capacity, tendency, or effect of deceiving or misleading consumers, whether or not any consumer in fact was misled, deceived, or damaged as a result of the agent following the script." The PULJ found the following portions of the script to be misleading:

- The statement "as a [utility name] customer . . . you are eligible to receive one free month of electricity" when coupled with the promotional "price protection" offer pursuant to which agents told customers their rate would not change, caused customers to believe they were dealing with their utility company, not an electricity supplier.

- The statement that the call may be recorded for quality and training purposes when the calls were, in fact, recorded for the purpose of verifying the contract pursuant to

---

[21] COMAR 20.53.07.07B(1) states: "All supplier marketing or solicitation information, including that used by its agents or employees, shall include the supplier's Maryland license number in a clear and conspicuous manner."

21

the applicable regulations requiring that contracts arising from telephone solicitations be recorded.

- Telling customers that they were eligible to receive one month of free electricity on their utility bill by "using" smart energy. With respect to BGE customers in particular, because BGE had a "Smart Energy Rewards®" program, the PULJ found that the script had the tendency to mislead customers into thinking they were being offered a utility program or service.

- Statements related to the 6-month price protection plan that had the capacity to mislead or deceive customers into thinking that the price they were currently paying for electricity would not increase.

- Statements implying that the customer's current rate with their current utility would go up during high usage periods like winter and summer, which the PULJ determined were false and deceptive with respect to actual trends in the standard offer service.

- Failing to disclose, during the sales pitch portion of the call, the rate that the customer would pay once they switched to SmartEnergy, thereby misleading customers into thinking that the price would not increase from the current rate they were paying for electricity.

- The statement that the agent wanted to make sure that the price protection was being applied to the current account reinforced the deception that the price would not increase from the rate that customers were currently paying for electricity.

- Under the confirmation questions portion of the script—once the agent believed that the customer had agreed to the promotion being offered—the agent's statement that, "[n]ow I just need to ask you two quick questions to confirm the information we discussed." The PULJ determined that the statement was misleading because, in fact, the information that had been included up to that point in the sales pitch had *not* been previously discussed.

- In an attempt to obtain affirmative confirmation by the customer to all terms and conditions of the contract, the agent read a statement containing several pieces of information, and then customers were asked if they understood their right to cancel. The statement was misleading as to whether the customer was assenting to all the terms mentioned, or only whether the customer understood that they had the right to cancel.

22

### c. *Findings Related to the Audio Recordings*

The PULJ found that the confusing, deceptive, and misleading nature of the script was confirmed by the testimony and a review of the audio recordings associated with the CAD complaints, as well as additional audio recordings that were admitted into evidence that were not associated with the CAD complaints. Based upon this evidence, the PULJ found, among other things, that:

- The initial focus of the telephone transactions was the promotional one month of free electricity.

- The agents failed to always disclose that the "free month" of electricity was based upon the customer's seventh month of SmartEnergy's retail supply and was only available if the customer sent in the redemption or rebate form—which the PULJ found to be a "material condition" that was omitted in violation of the applicable regulations.

- The agents emphasized that the customer's services would remain the same.

- In addition to the misleading scripted statements, agents made other false, misleading, or deceptive statements during the telephone transactions.

- The problematic telephone transactions were not limited to those that became the subject of the CAD complaints.

- Agents thwarted customers' attempts to cancel their enrollments, which the PULJ found to be particularly egregious because during the contracting process, when customers expressed doubt about enrolling, agents stressed the ability to cancel at any time.

### d. *Findings Related to the Training and Monitoring of Agents*

The PULJ also found that SmartEnergy failed to monitor sales calls and violated applicable regulations pertaining thereto on a systematic basis.[22] To support this finding,

---

[22] In support of this finding, the PULJ cited to COMAR 20.53.10.04F, which requires an electricity supplier to monitor telephonic marketing and sales calls to: (1)

23

the PULJ found that "the sales calls in the record in this case evidence recurring instances of agents failing to provide accurate and complete information and failing to answer questions" as required by applicable regulations. The PULJ also determined that the violations were "recurring and involved various agents[.]"

> e. *Conclusions Related to the Pattern or Practice of Systematic Violations of the Choice Act and the Commission's Regulations*

Based upon the testimony and evidence presented, the PULJ concluded that SmartEnergy engaged in a pattern or practice of systematic violations of the consumer protection provisions contained in the Choice Act and the Commission's regulations.[23] Notably, the PULJ found that the telephone transactions were based upon the written script, and that SmartEnergy used the script as an outline for all of its telephone transactions during the period under investigation. Therefore, the PULJ specifically rejected SmartEnergy's "tenuous claims" that it made in its post-hearing briefing that any finding that the telephone transactions were deceptive or misleading would be based upon a "statistically flawed sample" of CAD complaints, "would suffer from selection bias" in the selection of audio recordings, or be "based on a sample size that is too small[.]"

---

evaluate the supplier's training program; and (2) ensure that the agents are providing accurate and complete information and complying with applicable regulations.

[23] Specifically, the PULJ found that SmartEnergy violated PU § 7-505(b)(7), which prohibits an energy supplier from engaging in marketing, advertising, or trade practices that are unfair, false, misleading, or deceptive, COMAR 20.53.07.07A(2) (containing the same prohibition), and COMAR 20.53.07.08C(4)(b)(i)–(iii), (v), which governs sales contracts arising from telephone solicitations that are exempt from the requirements of the MTSA.

*f. Recommended Remedies and Penalties*

Based upon these findings, the PULJ recommended that the Commission impose a moratorium prohibiting SmartEnergy from adding or soliciting new customers and requiring SmartEnergy to notify its current and former customers of the Commission's decision. The PULJ also recommended that SmartEnergy be required to cancel existing customer enrollments and return those customers to the utilities' standard offer service unless the customer took affirmative action to remain with SmartEnergy. The PULJ further recommended that the Commission require that the rates charged by SmartEnergy be re-rated to the utility standard offer service rate, and that current and former SmartEnergy customers be refunded the difference for each month of service.

Finally, the PULJ considered the statutory criteria that the Commission must apply in fashioning a civil penalty for violations of the Choice Act, which consist of: (i) the number, if any, of previous violations of the Act; (ii) the gravity of the current violations; and (iii) the electricity supplier's good faith attempts to achieve compliance after notification of the violation. PU § 7-507(l)(3). Given the Commission's statutory authority to impose a civil penalty of not more than $10,000 for each violation, the Commission Staff believed that the Commission would be justified in assessing a civil penalty in excess of $500,000. The OPC recommended a civil penalty of $3,158,900, which it based upon the number of Marylanders enrolled in SmartEnergy's contracts multiplied by $100 per customer. SmartEnergy suggested a monetary penalty of $300,000.

Based upon its review of all of the evidence, the PULJ found SmartEnergy's violations to be "egregious." The PULJ further determined that, when CAD requested

25

documentation from SmartEnergy following customer complaints, SmartEnergy edited the telephone recording and provided only the final confirmation questions portion of the recording, "thereby withholding the sales portion of the call that might contain misrepresentations or deception." Specifically, the PULJ noted that the record reflected that SmartEnergy either: (1) did not listen to an entire recording before responding to CAD, in order to be in a position to take remedial action, or (2) listened to the recording but, nonetheless, failed to take appropriate action after being notified of the alleged violations of consumer protection laws and/or the Commission's regulations. With respect to SmartEnergy's failure to send the contract summaries required by the Choice Act regulations, the PULJ found that the record reflected that SmartEnergy had knowledge of its violation of the Commission's regulations and admitted that it failed to take action to achieve compliance until after the Commission Staff filed its complaint.

The PULJ acknowledged that SmartEnergy took "prompt action to achieve compliance when doing so was relatively easy or inexpensive"—providing the example of SmartEnergy adding its license number to its direct marketing materials after CAD notified it of that violation. The PULJ found, however, that SmartEnergy did not address "more serious violations" until it began a "process of remediation in June 2019." Accordingly, the PULJ found, "for a significant period of time, numerous Maryland consumers were subjected to SmartEnergy's deceptive marketing and trade practices." Ultimately, the PULJ recommended that the Commission, "at a later date, address whether $300,000 or some other amount is the appropriate civil monetary penalty to be imposed," after the

26

Commission has an opportunity to review SmartEnergy's compliance with the directives contained in the Commission's final order.

### 2. Commission's Decision and Order

SmartEnergy, the Commission Staff, and the OPC each appealed aspects of the PULJ's findings of fact and proposed order.[24] SmartEnergy argued that several findings by the PULJ were arbitrary, capricious, and not supported by the evidence. The Commission Staff and the OPC argued that the PULJ erred as a matter of law in concluding that the MTSA did not apply to the telephone transactions. The Division filed an amicus memorandum in support of the Commission Staff's and the OPC's arguments pertaining to the applicability of the MTSA.

On March 31, 2021, the Commission entered a 66-page decision and order that affirmed the PULJ's findings of fact and proposed order in part, reversed it in part, and clarified it in part.

### a. Conclusion Concerning the Applicability of the MTSA

With respect to the Commission Staff's and the OPC's arguments concerning the applicability of the MTSA, the Commission reversed the PULJ's conclusion and determined that the MTSA applied to SmartEnergy's business practices. The Commission also concluded that the plain language of the MTSA does not differentiate between inbound and

---

[24] Under the Public Utilities Article, where the Commission has delegated a matter to a PULJ, any party may file an appeal to the Commission of the PULJ's findings of fact and proposed order within 30 days. PU §§ 3-104(d)(3), 3-113(d)(2). On appeal, the Commission is required to: consider the matter on the record before the PULJ, "conduct any further proceedings that it considers necessary including requiring the filing of briefs and the holding of oral argument[,]" and issue a final order. *Id.* § 3-113(d)(3).

outbound calls, and that such a distinction "conflate[d] the 'initiation' of the telephone call and the initiation of the attempt by the merchant to sell or lease consumer goods." It determined that, because the attempt to sell was "initiated" by SmartEnergy via the postcard, and the attempt to sell was "made entirely by telephone," the MTSA applied. The Commission noted that its interpretation of the MTSA was consistent with the Division's interpretation, pointing out that this Court has applied some deference on occasion to the Division's interpretation of the consumer protection statutes, as it is the agency primarily charged with their enforcement. The Commission rejected SmartEnergy's argument that the sales fell within the MTSA's exemptions that apply to certain transactions involving marketing materials and sales to pre-existing customers, and found that, by failing to provide customers with written contracts, SmartEnergy violated the MTSA.

### b. Affirmance of PULJ Findings Related to Misleading and Deceptive Trade Practices

Next, the Commission rejected SmartEnergy's argument that the PULJ erred in finding that SmartEnergy's written telephone script had the capacity, tendency, or effect of deceiving or misleading customers. In its decision, the Commission reviewed each finding made by the PULJ pertaining to the telephone script, determined that the findings were supported by substantial evidence, and affirmed them.

The Commission also affirmed the PULJ's findings that: SmartEnergy's sales agents regularly thwarted customers' attempts to cancel SmartEnergy's service; SmartEnergy failed to monitor agents' sales calls as required by the Commission's regulations; and SmartEnergy did not have an independent third party verify customer

28

confirmation for purposes of its enrollments and contracts. The Commission further found that SmartEnergy's supplier license number that was added to the postcards in July 2018 was not provided in a "conspicuous manner" as defined by CL § 1-201(b)(10) and, therefore, SmartEnergy violated the requirements of COMAR 20.53.07.07B(1).[25]

### c. Conclusions Related to SmartEnergy's "Selection Bias" Argument

Finally, the Commission addressed SmartEnergy's "selection bias" argument. SmartEnergy contended that the OPC's and the Commission Staff's expert witness analysis that was presented to the PULJ was comprised by selection bias, meaning "[w]here a sample is drawn from a subsection of the overall population that possesses some trait not shared by the remainder of the population, a study of that sample will tend to produce inaccurate results if this subsection-specific trait affects or correlates with the dependent variable in some way." SmartEnergy argued that selection bias rendered the assessment based upon 34 complaints unreasonable and, therefore, the findings in the PULJ's proposed order were arbitrary and capricious.

The Commission Staff pointed out that SmartEnergy raised its selection bias argument in post-hearing briefing, without expert testimony, and without the possibility of cross-examination by the parties. As such, the Commission Staff argued that there was no

---

[25] COMAR 20.53.07.07B(1) requires that the supplier's Maryland license number on all marketing or solicitation materials appear in a "clear and conspicuous manner." CL § 1-201(b)(10) defines "conspicuous" as whether it is noticeable using a reasonable person standard. The Commission concluded that the license number did not comply with the statute and regulation because it was smaller than the main portion of the solicitation, placed at the bottom of the postcards within the "fine print," and was less noticeable than the offer of "FREE ELECTRICITY" and SmartEnergy's toll free telephone number.

evidence in the record to support or validate this theory, and the PULJ was therefore correct to disregard it.

The Commission rejected SmartEnergy's selection bias argument, concluding that, because SmartEnergy, as the party asserting the affirmative issue and thus bearing the burden of proof, failed to present testimony on the issue, the PULJ was not obliged to consider it. The Commission further concluded that, as an evidentiary matter, SmartEnergy—which was in possession of all 34,000 audio recordings from which the OPC's and the Commission Staff's "sample" was taken—had the ability, if it wished, to present an opposing sample for the PULJ's consideration. Accordingly, the Commission concluded that any due process to which SmartEnergy claimed it was entitled and denied, must take into account that SmartEnergy failed to produce any evidence challenging the OPC's and the Commission Staff's evidence.

### d. Conclusions Regarding Remedies and Deferral of Penalty

With respect to the PULJ's proposed remedies, SmartEnergy made several objections. SmartEnergy asserted that requiring it to re-rate customer bills and provide refunds based upon the utility standard offer service rates was arbitrary and capricious, and further argued that any comparison of its rate, which is for a renewable product, would result in an "apples to oranges" comparison with utility standard offer service rates. SmartEnergy also argued that the PULJ's proposal, which required that customers who wished to remain enrolled as a SmartEnergy customer take affirmative action, was "unprecedented and unjustified." SmartEnergy acknowledged that it made "certain errors" and proposed to pay a penalty of $300,000 and to adopt other measures going forward.

However, SmartEnergy asserted that the re-rate and refund recommendations in the PULJ's proposed order exceeded the penalties warranted in this case and were "inconsistent with Commission precedent." SmartEnergy also asserted that the proposed order failed to account for the remedial measures it had taken, which it contended "included a complete audit of its customer-facing documents, including scripts and contracts, and internal systems and practices, to ensure continued future compliance with Maryland law."

With respect to the monetary civil penalty, the Commission Staff recommended a civil penalty of at least $500,000, and the OPC recommended a penalty of at least $3,164,000. In addition, the Commission Staff recommended that the Commission revoke SmartEnergy's license. The OPC recommended that the Commission suspend SmartEnergy's license and, after the full re-rate amount is determined, consider revoking SmartEnergy's license in light of the "extent of SmartEnergy's pattern and practice violations." The OPC's recommended penalty was apparently modeled on two other Commission cases, which it cited to the Commission.

Turning to the remedies and penalties, the Commission found that SmartEnergy violated the MTSA, CL § 14-2203(b) (requiring that a contract made pursuant to a telephone solicitation be reduced to writing and signed by the consumer), and reiterated its earlier determination that the PULJ's findings "were supported by substantial evidence of systematic violations by SmartEnergy of multiple statutes and regulations," including PU § 7-505(b)(7) (prohibiting electricity suppliers from engaging in marketing, advertising, or trade practices that are unfair, misleading or deceptive); the applicable provisions of the MCPA, CL §§ 13-301(1)(3), 13-303 (prohibiting false and misleading trade practices that

have the capacity, tendency, or effect of deceiving or misleading customers); and the Commission's regulations.[26]  Based upon these findings, the Commission concluded that the record in this case warranted cancellation of all SmartEnergy customer enrollments in Maryland that occurred over the telephone, the return of all such customers to utility standard offer service, and the issuance of refunds to affected customers for the difference between SmartEnergy's rate and the customers' utilities' standard offer service.  The Commission also concluded that the record in this case supported a continuation of the moratorium prohibiting SmartEnergy from adding or soliciting new customers in Maryland.

In entering the portion of the order canceling SmartEnergy's enrollments and requiring customer refunds, the Commission observed that under the MTSA, a contract made pursuant to a telephone solicitation is not valid and enforceable against a consumer unless it is made in compliance with the requirements of the statute.  Having reversed the

---

[26] The regulations that the Commission found SmartEnergy to have violated included:  COMAR 20.53.07.07A(2) (prohibiting marketing or trade practices that are unfair, false, misleading, or deceptive); *id.* 20.53.07.07B(1) (requiring that all supplier marketing or soliciting information include the supplier's Maryland license in a clear and conspicuous manner); *id.* 20.53.07.08C(4)(b)(i) (requiring compliance with the contracting requirements under the MTSA), (ii) (requiring that the supplier confirm that customer questions relating to the contract are answered), and (iii) (requiring that the supplier confirm that an independent third party verify the contract or record the entire telephone conversation and retain the recording for the duration of the contract); *id.* 20.53.07.08C(4)(b)(v) (requiring that the supplier disclose all material contract terms and conditions to the customer over the telephone); *id.* 20.53.07.08B(1) (requiring the supplier, at the time of completion of the contracting process, to provide the customer with a copy of the executed contract and completed contract summary in the form provided by the Commission); *id.* 20.53.10.04F (requiring the supplier to monitor telephonic sales calls); *id.* 20.61.04.01B (requiring suppliers that market renewable energy products include required renewable portfolio standard information in their contracts); and *id.* 20.61.04.01C (requiring the disclosure of renewable product compliance fees).

PULJ's conclusion that the MTSA did not apply to SmartEnergy's business practices, the Commission concluded that the PULJ's "opt-in" recommendation that would "allow SmartEnergy to perfect contracts with its Maryland customers solicited via telephone was therefore moot." The Commission cited to the remedies that it had imposed in two prior administrative cases before it, stating that "[w]here competitive retail suppliers have failed to comply with the MTSA's contracting requirements, the appropriate remedy has been cancellation of the supplier's Maryland invalid customer enrollments and requiring those customers to be returned to utility standard offer service."

Having concluded that SmartEnergy violated the MTSA, the MCPA, the Choice Act, and the Commission's regulations, the Commission entered a final order continuing the moratorium prohibiting SmartEnergy from soliciting or enrolling new customers in Maryland until further order of the Commission, and directing SmartEnergy to: (1) return all of its Maryland customers who were solicited and enrolled via telephone sales to the utility standard offer service within ten days of the date of the order; (2) refund the difference between SmartEnergy's supply charges and the applicable standard offer service rate from the local utility for all periods that any current or former customer was served; and (3) send a letter to all of its Maryland customers explaining: (i) the Commission's determination that SmartEnergy violated state laws and regulations; (ii) that SmartEnergy's customers are being returned to the utility's standard offer service without penalty; and (iii) how refunds (if any) will be calculated. The Commission also adopted any findings by the PULJ "that were not expressly vacated or modified" by its decision and order.

33

Finally, the Commission reserved its final decision regarding the possibility of license suspension and/or revocation, and the assessment of a civil monetary penalty, until after SmartEnergy complied with the directives in the Commission's order, including making refunds to all customers who had invalid contracts. The Commission stated that SmartEnergy's compliance with its directives would be considered in the assessment of any civil monetary penalty.

## C. Judicial Review

SmartEnergy filed a petition for judicial review in the Circuit Court for Montgomery County. Before the circuit court, SmartEnergy argued that: (1) the MTSA did not apply to its business transactions, or alternatively, exemptions to the MTSA applied to its conduct; (2) the Commission's findings were unsupported by substantial evidence; and (3) the penalty levied was arbitrary and capricious. The circuit court entered an order affirming the Commission's decision.

Thereafter, SmartEnergy filed an appeal to the Appellate Court of Maryland. The Appellate Court affirmed the circuit court's judgment. *In re SmartEnergy Holdings, LLC*, 256 Md. App. 20 (2022). Before the Appellate Court, SmartEnergy argued that the Commission lacked the jurisdiction to consider the application of the MTSA. The Appellate Court rejected SmartEnergy's argument and held that the Commission has jurisdiction to determine whether an electricity supplier violated the State's consumer protection laws, including the MTSA. *Id.* at 42.

The court next addressed and rejected SmartEnergy's argument that the MTSA does not apply to its conduct. *Id.* The Appellate Court considered the plain language of

34

"telephone solicitations" in the MTSA within the context of its legislative purpose and statutory scheme, as well as the legislative history, and concluded, as the Commission found, that SmartEnergy's conduct fell within the definition and, accordingly, that the MTSA applied. *Id.* at 43–48. The court determined that SmartEnergy's conduct did not fall within statutory exemptions for pre-existing business relationships with clients and marketing materials containing specific information required by the MTSA, and that the Commission, therefore, did not err in declining to apply either statutory exemption to SmartEnergy's conduct. *Id.* at 48–50.

The Appellate Court considered each of the Commission's findings that formed the basis of its conclusion that SmartEnergy engaged in systematic violations of Maryland law— that (1) SmartEnergy failed to comply with the contracting requirements under the MTSA; (2) the postcards violated the Choice Act, the MCPA, and the Commission's regulations; (3) the sales script was misleading and deceptive; (4) SmartEnergy thwarted customers' efforts to cancel their service; and (5) SmartEnergy failed to properly train its representatives and monitor the calls. The Appellate Court concluded that each of the findings underpinning the Commission's decision was supported by substantial evidence. Finally, the Appellate Court determined that the remedies imposed by the Commission were not arbitrary or capricious.

Thereafter, SmartEnergy filed a petition for writ of *certiorari*, which we granted to consider the following questions, which we have reformatted and rephrased as follows: [27]

---

[27] The questions presented in the petition for writ of *certiorari* were:

1. Did the Appellate Court err in finding that the Commission has jurisdiction to interpret and enforce the MTSA?

2. Did the Commission err in determining that the MTSA applied to SmartEnergy's electricity marketing and sales practices?

3. Was the Commission's decision, affirming the PULJ's findings that SmartEnergy's business practices violated the Choice Act, the MCPA, and the Commission's additional findings that SmartEnergy's business practices violated the MTSA, supported by substantial evidence in the record as a whole?

4. Were the Commission's remedies imposed upon SmartEnergy resulting from the violation of Maryland's consumer protection laws arbitrary or capricious?

---

1. Did the Appellate Court err in finding that the Commission has jurisdiction to interpret and enforce the MTSA?

2. Did the Appellate Court err in finding a violation of the MTSA in a telephone call made by a potential customer to SmartEnergy in response to a previously mailed postcard, which was therefore not "made entirely by telephone" and "initiated by the merchant"?

3. Did the Appellate Court err in holding that the Commission's findings and penalties imposed, which included, for example, a sample bias of extrapolating 34 complaint calls out of 104,000 were not supported by substantial evidence and were not arbitrary and capricious?

We have not rephrased question one—related to the Commission's jurisdiction to interpret the MTSA—because it was not raised until SmartEnergy's brief to the Appellate Court. Although we ordinarily do not address questions that were not presented to the administrative agency, lack of subject matter jurisdiction may be raised at any time, including initially on appeal. *See, e.g.*, *County Council of Prince George's County v. Dutcher*, 365 Md. 399, 405 & n.4 (2001). We have rephrased questions two and three because we review the agency's decision directly, and not the decision of the circuit court or the Appellate Court. Moreover, we have broken SmartEnergy's third question into two separate questions, given that question three encompasses SmartEnergy's arguments related to the Commission's factual findings, as well as the Commission's remedies imposed for violations of the applicable consumer protection laws, each of which require a separate analysis.

For the reasons set forth herein, we answer no to questions one, two, and four, and yes to question three.

**III**

**Discussion**

*A. Standard of Review*

In an appeal arising from judicial review of an agency's decision, we review the agency's decision directly, not the decision of the circuit court or the Appellate Court. *Md. Office of People's Counsel v. Md. Public Service Comm'n*, 461 Md. 380 (2018). The General Assembly has set forth our general standard of review of an action by the Commission in PU § 3-203, which states:

> Every final decision, order, or regulation of the Commission is prima facie correct and shall be affirmed unless clearly shown to be:
> (1) unconstitutional;
> (2) outside the statutory authority or jurisdiction of the Commission;
> (3) made on unlawful procedure;
> (4) arbitrary or capricious;
> (5) affected by error or law; or
> (6) if the subject of review is an order entered in a contested proceeding after a hearing, unsupported by substantial evidence on the record considered as a whole.

As we have previously observed, the standard of review of Commission decisions under PU § 3-203 is consistent with the standard of review applicable to all administrative agencies, including review under the Administrative Procedure Act ("APA"). *Office of People's Counsel*, 461 Md. at 392; *see also Office of People's Counsel v. Md. Public Service Comm'n*, 355 Md. 1, 15 (1999); *Town of Easton v. Public Service Comm'n*, 379 Md. 21, 31 (2003).

In *Office of People's Counsel*, we noted that "PU § 3-203 also appears to be a more deferential standard in some respects compared to the standard of review under the APA."

37

461 Md. at 392. We pointed out that "the General Assembly has directed that the Commission's decision is '*prima facie* correct' and is to be affirmed unless the listed defects are 'clearly shown.'" *Id.* "In giving meaning to this language in PU § 3-203 without rendering it surplusage, we believe that it calls for a court to be particularly mindful of the deference owed to the Commission on those issues on which courts typically accord some degree of deference to administrative agencies—*i.e.*, findings of fact, mixed questions of law and fact, and the construction of particular statutes" that the Commission administers,[28] and regulations adopted by the agency. *Id.* at 393–94 (footnotes omitted). By contrast, we observed that, on questions in which a court would not typically apply agency deference—such as general questions of law, jurisdiction, or constitutional questions—PU § 3-203 requires no greater deference to the Commission than any other

---

[28] In this case, the Commission asserts that we should defer to its statutory interpretation of the MTSA. We disagree. As discussed herein, the Division is the agency that has been given primary jurisdiction to enforce Maryland's consumer protection laws. A violation of the MTSA is a violation of the MCPA. As the agency primarily responsible for enforcing and administering the MCPA, to the extent this Court applies agency deference to an agency's interpretation of the MTSA, we would apply such deference to the Division's interpretation. *See Scull v. Groover, Christie & Merritt P.C.*, 435 Md. 112, 129 (2013) (stating that the "interpretation of the statute by the agency charged with administering it is entitled to considerable weight[]"); *see also Converge Services Group, LLC v. Curran*, 383 Md. 462, 479 (2004) (stating that "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. This reliance, however, is not blind. A court does not err or abuse its discretion if it seeks to answer a purely legal question that merely overlaps with an available administrative remedy[ ]" (citations and internal quotations omitted)). In this case, as discussed *infra*, whether SmartEnergy's business practices fall within the definition of "telephone solicitation" involves a purely legal question involving statutory interpretation. As such, we decline to apply agency deference. That said, we are mindful that our plain language interpretation is the same as the Division's—which the Division asserts it has been applying for decades.

agency. *Id.* at 394. Questions of law "are completely subject to review by courts. In sum, with respect to the Commission, this Court has tended to accord particular deference (though not total deference) to [Commission] decisions." *Id.* (cleaned up).

With respect to questions of fact, we review the "record as a whole" to determine whether substantial evidence exists to support the Commission's decision, which again, is presumed to be correct, and must be affirmed, unless SmartEnergy "clearly show[s]" otherwise. PU § 3-203(6). Under the "substantial evidence" standard, we consider whether a "reasoning mind reasonably could have reached the factual conclusion reached by the agency." *Comptroller v. FC-GEN Operations Investments LLC*, 482 Md. 343, 359 (2022) (internal quotation marks and citations omitted). "We view the agency's decision in the light most favorable to the agency and trust the agency's resolution of conflicting evidence and inferences drawn therefrom." *Id.* (cleaned up).

Finally, where a matter is committed to the agency's discretion—such as imposing a remedy or civil penalty—we apply the arbitrary or capricious standard, which is highly deferential. *Md. Dep't of the Env't v. Assateague Coastal Trust*, 484 Md. 399, 449 (2023); *Md. Aviation Admin. v. Noland*, 386 Md. 556, 581 (2005).

In this case, we apply: (1) a de novo standard of review to the first two questions presented—whether the Commission has jurisdiction to enforce the MTSA, and whether the MTSA applies to SmartEnergy's business practices; (2) the substantial evidence standard to our review of the Commission's findings of fact presented in question three; and (3) the arbitrary or capricious standard to question four pertaining to the Commission's discretionary imposition of remedies and penalties.

*B. Analysis*

### 1. The Commission's Jurisdiction to Enforce the State's Consumer Protection Laws, Including the MTSA

SmartEnergy asserts that the Commission lacks the jurisdiction to interpret and enforce the MCPA and the MTSA. According to SmartEnergy, nothing in the MTSA authorizes the Commission to enforce its provisions. SmartEnergy points out that a violation of the MTSA constitutes an unfair or deceptive practice under the MCPA, and that the General Assembly has charged the Division—not the Commission—with the duty to administer and enforce the MCPA. The Commission, the OPC, and the Division[29] disagree with SmartEnergy's jurisdictional argument, and assert that the plain language of the MTSA and MCPA, when read together, clearly authorize the Commission to enforce the State's consumer protection laws, including the MTSA, as part of its authority to regulate electricity suppliers. We agree with the Commission's, the OPC's, and the Division's plain language interpretation.

SmartEnergy is an "electricity supplier" over which the Commission has jurisdiction. PU §§ 1-101(l), 2-112. The General Assembly has directed the Commission to ensure that electricity suppliers comply with the statutory provisions of the Choice Act, as well as the regulations promulgated by the Commission. As noted above, under the Choice Act, the Commission has the power to conduct its "own investigation" and upon a

---

[29] The Division has participated as an amicus curiae in this matter since the appeal before the Commission. We discuss the Division's position in connection with our review, given that the Division is the primary agency responsible for administering the State's consumer protection laws and the agency to which we may apply deference when appropriate.

finding of "just cause," impose remedies for a violation of the Choice Act or the Commission's regulations, including imposing a civil penalty, ordering a refund or credit to a consumer, imposing a moratorium on adding or soliciting additional customers, or even revoking or suspending the electricity supplier's operating license. PU § 7-507(k)(1). The statutory definition of "just cause" includes an electricity supplier's violation of "any other applicable consumer protection law of the State." *Id.* § 7-507(k)(3)(viii). Thus, under the plain language of the Choice Act, the Legislature has granted the Commission the authority to "investigate" electricity suppliers to determine whether a penalty or other remedy should be levied for "just cause," which exists if the supplier violated the consumer protection laws of Maryland. We agree with the Appellate Court that the Commission has the authority to ensure that electricity suppliers, such as SmartEnergy, "comply with specific consumer protection laws, under which the MTSA falls." *In re SmartEnergy*, 256 Md. App. at 42.

We further observe that the Commission's enforcement authority under the Choice Act is consistent with the enforcement authority granted to state agencies under the MTSA and the MCPA. The MTSA states that violations of its provisions can be enforced by "any remedies . . . available at law." CL § 14-2205. Certainly, the Commission's statutory authority to impose remedies on an electricity supplier when it finds, upon its own investigation, that the supplier has violated Maryland's consumer protection laws, would constitute "remedies available at law" to the Commission. Moreover, as noted above, a violation of the MTSA constitutes an unfair or deceptive trade practice under the MCPA, *see* CL §§ 14-2205(1), and can be enforced as a violation of the MCPA, *see id.* § 13-

41

301(14)(xiv). And as we also discussed above, although the Division is the agency that has primary public enforcement authority of Maryland consumer protection laws, the MCPA also expressly confers enforcement authority upon "each agency of the State within the scope of its authority." *Id.* § 13-103(c). Indeed, the Choice Act recognizes the overlapping enforcement authority granted to the Division and the Commission over violations of the consumer protection laws by electricity suppliers. *See* PU § 7-507(q). It is clear from the provisions of these interrelated statutory schemes that the General Assembly did not intend to confer exclusive jurisdiction on the Division for the enforcement of consumer protection statutes where the entity under investigation is an electricity supplier under the regulatory authority of the Commission.

Accordingly, we hold that, under the plain language of the Choice Act, the General Assembly granted the Commission the express authority to determine whether electricity suppliers under its jurisdiction have violated Maryland's consumer protection laws, including the MTSA, and to impose statutory remedies when it determines that the supplier has violated any applicable consumer protection law of this State.

## 2. Whether SmartEnergy's Business Practices Fall Within the MTSA

Having concluded that the Commission has the jurisdiction to interpret and enforce the MTSA, we must determine whether SmartEnergy's business practices—mailing postcards that prompt customers to call SmartEnergy, which in turn, result in SmartEnergy's agents making electricity sales during a telephone call—fall within the

42

scope of the MTSA. In considering the parties' competing interpretation of the MTSA, we apply the following principles of statutory interpretation.

"The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010) (citations omitted). "We begin with an examination of the text of a statute within the context of the statutory scheme to which it belongs." *Nationstar Mortgage LLC v. Kemp*, 476 Md. 149, 169 (2021) (citations omitted). "We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application." *Lockshin*, 412 Md. at 275 (internal quotation marks and citations omitted). Rather, we construe the statute "as a whole so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Koste v. Town of Oxford*, 431 Md. 14, 25–26 (2013) (internal quotation marks and citations omitted). We "do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Lockshin*, 412 Md. at 275 (citations omitted). In other words, "[r]eview of the text does not merely entail putting the words under the microscope by themselves with a dictionary at hand, because words that appear clear and unambiguous when viewed in isolation may become ambiguous when read as part of a larger statutory scheme." *Kemp*, 476 Md. at 169 (internal quotation marks and citations omitted); *see also Johnson v. State*, 360 Md. 250, 265 (2000) (explaining that the Court must analyze the statute "in its entirety, rather than independently construing its sub-parts[]"). "We presume that the Legislature intends its enactments to operate together as a

43

consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Lockshin*, 412 Md. at 276 (citations omitted). As this Court has explained,

> [w]here the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing interpretations.

*Id.* (citations omitted).

"Finally, we check our interpretation against the consequences of alternative readings of the text." *Bell v. Chance*, 460 Md. 28, 53 (2018). Doing so ensures that we adopt an interpretation that avoids a construction that is "illogical, unreasonable, or inconsistent with common sense." *Reier v. State Dep't of Assessments & Taxation*, 397 Md. 2, 33 (2007) (internal quotation marks and citations omitted). Indeed, "[i]t has been called a golden rule of statutory interpretation that, when one of several possible interpretations produces an unreasonable result, that is a reason for rejecting that interpretation in favor of another which would produce a reasonable result." *Id.* at 34. (internal quotation marks and citations omitted); *see also Kemp*, 476 Md. at 170 (explaining that "it is important to consider the consequences of alternative interpretations of the statute, in order to avoid constructions that are illogical or nonsensical, or that render a statute meaningless[]" (internal quotations and citations omitted)).

44

### a. Statutory Text

As we discussed above, the MTSA is a consumer protection statute that applies to contracts arising from a "telephone solicitation" as defined by the Act. Where a transaction falls within the provisions of the statute, it is not "valid and enforceable" against a consumer unless it is in writing and complies with the provisions of CL § 14-2203.

To determine whether SmartEnergy's business practices fall within the purview of the MTSA, we start with the plain language of the statute, which applies to a "telephone solicitation." The MTSA states: "'telephone solicitation' means the attempt by a merchant to sell or lease consumer goods, services, or realty to a consumer located in this State that is: (1) Made entirely by telephone; and (2) Initiated by the merchant." CL § 14-2201(f). The parties have put forth two competing interpretations of this language. Despite their competing interpretations, each of the parties contends that the language is unambiguous and supports their respective interpretation.

SmartEnergy contends that the Commission erred in finding that it engaged in telephone solicitations under the MTSA and, therefore, the contract requirements under the statute do not apply to the electricity enrollments that it makes during a telephone call prompted by prospective customers calling the number on the postcard. According to SmartEnergy, its business practices do not fall within the definition of "telephone solicitation" because if the "attempt to sell" requirement is interpreted to include: (1) the act of mailing a postcard then it would not take place "entirely by telephone"; or (2) a telephone call placed by a potential customer, then it is not "initiated by the merchant."

45

Under SmartEnergy's interpretation, the act which *initiates* the attempt to sell—here, mailing the postcard—is necessarily *part of the attempt to sell* itself.

The Commission, the OPC, and the Division argue that the plain language supports their interpretation that SmartEnergy's business practice does, in fact, fall within the statutory definition of "telephone solicitation." They contend that two distinct requirements must be satisfied for a merchant's attempt to sell consumer goods or services to fall within the MTSA. First, it is the merchant who must have "initiated" the attempt to sell. They assert that the MTSA does not prescribe any limitations on how a merchant can *initiate* a sales attempt, which they contend makes sense, because of the myriad of ways merchants can reach out to consumers. Second, the merchant must attempt to make a sale of a product or service to a consumer "entirely by telephone," which they posit, also makes sense for the obvious reason that the MTSA targets telemarketing sales. They further assert that the Appellate Court correctly concluded that, because "the statute, by its plain language, requires two distinct elements to have taken place, only one of which specifies the requirement that it be by telephone," the "initiation by the merchant is not limited to telephone." *In re SmartEnergy*, 256 Md. App. at 47. The Commission, the OPC, and the Division agree with the Appellate Court's analysis that, "[h]ad the legislature intended for the MTSA to apply only to sales the merchant initiates by telephone, it could have expressly indicated as much without writing the statute as conjunctive." *Id.* at 46. Accordingly, the Commission, the OPC, and the Division argue that the definition of "telephone solicitation" includes all situations in which a merchant initiates efforts that result in a merchant attempting to "make" a binding sale to a Maryland consumer over the telephone. The

46

Commission, the OPC, and the Division contend that, under the plain language of the MTSA, it applies to situations, such as the instant case, in which a merchant sends postcards to Maryland consumers that are specifically designed to prompt the consumer to call the merchant, at which time the merchant's salespeople try to "make" binding sales contracts with the consumer "entirely" over the telephone.

We conclude that the definition of "telephone solicitation," when read in isolation, is ambiguous because it is susceptible to more than one reasonable interpretation. Under SmartEnergy's interpretation, the initiation of the sales attempt—i.e., sending the postcard—is necessarily part of the attempt to sell itself, and therefore, must be "[m]ade entirely by telephone." When one reads the definition of "telephone solicitation" in isolation, SmartEnergy articulates a reasonable interpretation. However, the interpretation advanced by the Commission, the OPC, and the Division is also a reasonable one, and becomes even more rational and logical when one considers the definition within the larger statutory scheme, taking into account the stated purpose of the Act, its legislative history, and the consequences of the alternative interpretation. Once we examine the plain language utilizing our various tools for statutory interpretation, SmartEnergy's interpretation becomes illogical and untenable.

The dictionary definition of "initiate" is "to cause or facilitate the beginning of" something to occur. *Initiate*, Merriam-Webster (11th ed. 2020). Under SmartEnergy's business model, the postcard clearly sets in motion a telephone call to the merchant— SmartEnergy *causes* or *facilitates* the prospective customer's telephone call to inquire about receiving the one month of free electricity. Mailing the postcard is not necessarily

47

required to be part of the "attempt to sell"; rather, it represents the "initiation" of an "attempt to sell," which occurs "entirely by telephone."

Focusing on the definition in isolation, SmartEnergy's interpretation requires that we read the directive set forth in subsection (1)—that the attempt to sell be "entirely by telephone"—into subsection (2), *only if* the action that "initiates" an attempt to sell is part of the sales attempt itself. If the action that "initiates" a sale—here, the merchant's act of mailing the postcard—is part of the sale itself, then the directive in subsection (1) is, by definition, necessarily part of subsection (2).

However, the structure of the definition establishes two distinct requirements that are written in the conjunctive. When one reads the definition of "telephone solicitation" within the context of its structure, it can also be construed in a manner such that the postcard is the *initiation* of the attempt to sell, *i.e.*, the act that "causes or facilitates the beginning of" an attempt to sell, and the telephone call is the *attempt to sell*, which occurs entirely over the telephone. In our view, the most logical progression of the transaction contemplated by the definition is that the *initiation* of the attempt to sell and the *attempt to sell* itself are, or at least can be, two separate or distinct acts.

With this in mind, we next consider the parties' competing definitions within the larger statutory scheme.

### b. Statutory Scheme

As discussed above, the MTSA, through its definition of "telephone solicitation" in CL § 14-2202(f), defines certain transactions that fall within its statutory purview, and therefore, require a written contract that complies with CL § 14-2203 in order to be "valid

48

and enforceable against a consumer[.]"  In construing the definition of "telephone solicitation," it is notable that the MTSA not only describes the transactions that are *included* within its purview, but it also contains six categories of transactions that are *expressly exempted* from its application.  *See* CL § 14-2202(a).[30]  These exempted categories include

---

[30] Specifically, CL § 14-2202 states:

(a)  The provisions of this subtitle do not apply to a transaction:

(1)  Made in accordance with prior negotiations in the course of a visit by the consumer to a merchant operating a retail business establishment which has a fixed permanent location and where consumer goods are displayed or offered for sale on a continuing basis;

(2)  In which the person making the solicitation or the business enterprise for which the person is calling:
(i)  Has made a previous sale to the consumer; or
(ii)  Has a preexisting business relationship with the consumer;

(3)  Which is covered by the provisions of Subtitle 3 of this title;

(4)  In which:
(i)  The consumer may obtain a full refund for the return of undamaged and unused goods to the seller within 7 days of receipt by the consumer; and
(ii)  The seller will process the refund within 30 days of receipt of the returned merchandise by the consumer;

(5)  In which the consumer purchases goods or services pursuant to an examination of a television, radio, or print advertisement or a sample, brochure, catalogue, or other mailing material of the merchant that contains:
(i)  The name, address, and telephone number of the merchant;
(ii)  A description of the goods or services being sold; and
(iii)  Any limitations or restrictions that apply to the offer; or

(6)  In which the merchant is a bona fide charitable organization as defined in § 6-101 of the Business Regulation Article.

(b)  Notwithstanding subsection (a) of this section, this subtitle applies to any solicitation offering credit services where:

telephone sales arising in certain circumstances in which a consumer previously visited the merchant's retail business where the consumer goods or services are sold, *see* CL § 14-2202(a)(1), or telephone sales in which the consumer and the merchant have a pre-existing relationship, *see id.* § 14-2202(a)(2). To highlight the unreasonable interpretation advanced by SmartEnergy, the Commission, the OPC, and the Division focus on one exemption, which they refer to as the "marketing materials exemption" set forth in CL § 14-2202(a)(5).

*The "Marketing Materials" Exemption*

Under the marketing materials exemption, the MTSA does not apply to transactions "[i]n which the consumer purchases goods or services pursuant to an examination of a television, radio, or print advertisement or a sample, brochure, catalogue, or other mailing material of the merchant that contains: (i) The name, address, and telephone number of the merchant; (ii) A description of the goods or services being sold; and (iii) Any limitations or restrictions that apply to the offer[.]" CL § 14-2202(a)(5). In other words, the marketing materials exemption creates a safe harbor provision in which—*if* the merchant's marketing materials satisfy the requirements of romanettes (i) through (iii) of CL § 14-2202(a)(5)— a merchant's telephone sale made pursuant to the customer's examination of such materials is exempt from the written contract requirements of the MTSA.

The Commission, the OPC, and the Division assert that the most reasonable and natural interpretation of this exemption is that it applies to the common situation where a

---

(1)   The consumer is required to call a telephone number;
(2)   The consumer is charged a separate toll fee for the call; and
(3)   The person making the solicitation receives any portion of the separate telephone toll fee paid by the consumer.

50

consumer first reviews marketing materials and then, enticed by their content and with complete knowledge of the identity of the merchant, the product or service being sold, and the material terms of the sale, makes a call to the merchant. SmartEnergy disputes this interpretation by simply referring us back to its plain language interpretation of the definition of "telephone solicitation." Based upon its interpretation, which requires that the merchant place an outbound call for the MTSA to be triggered, SmartEnergy contends that the marketing materials exemption applies only in situations in which a merchant places the call to the prospective consumer.

We agree with the Commission, the OPC, and the Division that reading the definition of "telephone solicitation" in CL § 14-2201(f) together with the marketing materials exemption in CL § 14-2202(a)(5) leads to only one logical reasonable interpretation—the MTSA applies when a consumer receives advertising materials, reviews them, places a call to the merchant, and the merchant then makes a sale of goods in response to the customer's call, *unless* the marketing materials contain the information required in CL § 14-2202(a)(5)(i) through (iii).

The interpretation of "telephone solicitation" advanced by SmartEnergy, when read together with the marketing materials exemption set forth in CL § 14-2202(a)(5), is illogical or nonsensical. Under SmartEnergy's interpretation, the merchant could send false and misleading marketing materials, and escape the mandates of the MTSA simply because the consumer called the merchant, instead of the merchant calling the consumer. Under its interpretation, the marketing materials exemption would apply only when: (1) the merchant places an outbound call to the consumer, during which the sale of the goods or services is

51

made entirely over the telephone call; (2) *but only after* the consumer has made an "examination of a television, radio, or print advertisement or a sample, brochure, catalogue, or other mailing material of the merchant" which contains the information required in romanettes (i) through (iii). Indeed, it is hard to imagine a scenario in which the merchant places a telephone call to a consumer, and during the call, the consumer makes a purchase "pursuant to the examination" of a postcard or mailing material that the consumer may happen to have on hand, or even more illogical, "pursuant to an examination" of a television or radio advertisement that happens to be playing during the call.

Furthermore, under SmartEnergy's interpretation, the merchant could make false and misleading statements in its marketing materials, but nonetheless make a valid telephone sale *if the customer placed the call* to the merchant in response to the deceptive marketing materials. By contrast, if the *merchant placed the call* to the consumer, it would only be permitted to make a telephone sale if the merchant's marketing materials fell within the marketing materials safe harbor provisions set forth in CL § 14-2202(a)(5)(i)–(iii) or the transaction fell within one of the other enumerated exemptions in CL § 14-2202. Such an interpretation defies logic.

*Credit Services Provisions*

We further observe that the marketing materials exemption is not the only provision which contemplates that the MTSA covers transactions in which the consumer places a call to the merchant. As discussed, subsection (a) of CL § 14-2202 identifies categories of transactions that are excluded from the provisions of the MTSA. Subsection (b) identifies certain calls made by consumers in connection with credit services transactions that are *not*

52

excluded. In other words, subsection (b) contains an *exception* to the exemptions set forth in subsection (a) for transactions involving "credit services"[31]—thereby bringing these transactions back into the purview of the MTSA. Specifically, CL § 14-2202(b) states: "Notwithstanding subsection (a) of this section, this subtitle applies to any solicitation offering credit services where: (1) *The consumer is required to call a telephone number*; (2) The consumer is charged a separate toll fee for the call; and (3) The person making the solicitation receives any portion of the separate telephone toll fee paid by the consumer." (Emphasis added). The credit services provisions are another example of a transaction in which the Legislature expressly contemplated that the MTSA would apply to telephone calls placed by the customer to the merchant.

In conclusion, construing the various parts of the MTSA as a consistent and harmonious body of law, we determine there is only one reasonable and logical interpretation of "telephone solicitation"—it applies to both telephone calls initiated by the merchant, as well as telephone calls initiated by the consumer in response to marketing materials sent by the merchant, unless the transaction falls within one of the statutory exemptions outlined in CL § 14-2202.

---

[31] The MTSA includes a definition of "consumer services" as well as "credit services." "'Consumer services' includes any solicitation offering credit services where: 1. The consumer is required to call a telephone number; 2. The consumer is charged a separate toll fee for the call; and 3. The person making the solicitation receives any portion of the separate telephone toll fee paid by the consumer." CL § 14-2201(c)(2)(ii). "'Credit services' means providing or offering to provide any service in return for the payment of money or other consideration, where the service is held out to provide assistance to a customer with regard to: (1) Improving the consumer's credit history, credit rating, or credit record; or (2) Obtaining an extension of credit for the consumer." *Id.* § 14-2201(d).

53

### c. *Legislative Purpose and Legislative History*

Our interpretation of the plain text of the MTSA, read within the broader statutory context, is further bolstered by the legislative purpose underlying its enactment.[32] The MTSA was enacted by the General Assembly in 1988 in response to requests from the Montgomery County Office of Consumer Affairs, the Office of the Attorney General, and various business groups within the State. The General Assembly introduced House Bill 1019—the Maryland Telephone Solicitations Act—for the purpose of, among other things, requiring: (1) "that certain contracts solicited by telephone be reduced to writing in order to be enforceable;" (2) "that a contract made pursuant to a telephone solicitation meet

---

[32] SmartEnergy contends that the language of the statute is unambiguous, and therefore, this Court does not need to examine legislative history. To the extent that the Court looks to legislative history, SmartEnergy urges the Court to consider the legislative purpose behind the enactment of the federal Telephone Consumer Protection Act of 1991 ("TCPA"), which was enacted to protect people from intrusive nuisance calls to their homes from telemarketers, and the Maryland Telephone Consumer Protection Act ("MTCPA"), which mirrors the TCPA. According to SmartEnergy, the MTSA "builds upon" the federal and state law. As such, SmartEnergy claims that the General Assembly did not intend for the MTSA to regulate calls initiated by consumers, but rather "unsolicited advertisements over the telephone lines." *See AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*, 417 Md. 386, 391 (2010). SmartEnergy's argument is without merit for perhaps one simple reason—the MTSA was enacted in 1988, *see* 1988 Md. Laws, ch. 588, *before* the enactment of the TCPA and the MTCPA. The TCPA was enacted in 1991. Pub. L. No. 102–243 (1991) (codified as amended at 47 U.S.C. § 227). The MTSA could not "build upon" statutes that were not in existence at the time it was enacted. Moreover, even if these statutes had predated the MTSA, SmartEnergy's argument is inconsistent with the express purpose articulated by the Legislature in its enactment of the MTSA—to require that certain contracts solicited over the telephone be reduced to writing.

certain conditions;" and (3) "providing that a violation of this Act shall be an unfair and deceptive trade practice[.]"

In its explanation of House Bill 1019, the House Economic Matters Committee Floor Report explained that the Bill would require "that all contracts made pursuant to a telephone solicitation would be reduced to writing and signed by the consumer[,]" and that the language used in the contract would be required to "match the description of the goods or services" that were "principally used in the telephone solicitation."  Floor Report, H.B. 1019 at 1–2.  The Floor Report further explained:

> Telephone solicitations are, by nature, subject to certain problems.  The goods are not available for inspection and the identity of the seller is often unclear.  Even a faithful description of the contract terms is difficult when done entirely by phone.  As a consequence, there have been continuous problems associated with telephone solicitations in this State.  Frequently, the product or the service that the customer actually receives differs greatly from the solicitor's description of the product or service.

*Id.* at 2.

We agree with the Appellate Court's observation that "[t]he legislative history indicates that the MTSA's drafters recognized the need to address the prevailing problems consumers were experiencing with telephone solicitors using deceptive and misleading sales pitches, as well as the lack of verification of contract terms."  *In Re SmartEnergy*, 256 Md. App. at 46.  Through the enactment of the MTSA, the General Assembly sought to address these problems by requiring a written contract for all sales that arise from telephone solicitations, unless the particular transaction is exempt under one of the enumerated categories identified in the statute.

55

### d. *Consequences of SmartEnergy's Interpretation*

Finally, and as discussed in detail above, accepting SmartEnergy's interpretation of the MTSA—that it excludes telephone sales transactions arising from a consumer placing a call to a merchant in *response to marketing material*—would create an irrational loophole. As discussed above, under SmartEnergy's interpretation, the merchant could send false and misleading marketing materials, and escape the mandates of the MTSA simply because the consumer called the merchant, instead of the merchant calling the consumer. Such an interpretation is not only illogical, but it is also inconsistent with the legislative purpose and intent of the MTSA—to target deception in telemarketing and to ensure that attempts to sell goods or services be reduced to a written contract, so that it is clear to the consumer what is being purchased.

In conclusion, we hold that the MTSA applies to sales made over the telephone where a consumer places a telephone call to a merchant in response to a merchant's marketing materials, unless the transaction falls within one of the statutory exemptions outlined in CL § 14-2202. The plain language of the definition of "telephone solicitation" explicitly separates the requirement relating to the "making" of a sales attempt from the requirement relating to the "initiation" of a sales attempt. While each requirement must be satisfied for an "attempt by a merchant to sell" to be a "telephone solicitation," they do not, as written, apply to or limit each other. We disagree with SmartEnergy's interpretation that the *initiation* of the sales attempt is necessarily part of the sales attempt itself. SmartEnergy's act of sending the postcard "initiates" the attempt to sell. In other words, the postcard sets in motion SmartEnergy's attempt to sell electricity, which SmartEnergy "makes" entirely by

56

telephone.  We determine that, under the MTSA, the act or event that "initiates" a telephonic sales attempt is not necessarily the same as attempting to "make" a sale over the telephone—it can be, as here, the sending of marketing materials to consumers.

### 3. Whether the Commission's Findings Were Supported by Substantial Evidence in the Record as a Whole

We next turn to SmartEnergy's argument that the Commission's factual findings were not supported by substantial evidence.  In considering SmartEnergy's contentions, we are mindful of the highly deferential standard of review that the General Assembly has established for judicial review of the Commission's findings of fact contained in Commission orders and decisions—that is, the Commission's decision is "prima facie correct and shall be affirmed unless clearly shown to be" "unsupported by substantial evidence on the record considered as a whole."  PU § 3-203(6).  In undertaking our judicial review of the factual record of this proceeding, we are also mindful that the Commission delegated to the PULJ its authority to conduct a hearing and to issue a proposed order and findings of fact.  Here, the PULJ made extensive findings of fact, which the Commission reviewed, considered, and specifically adopted to the extent that they "were not expressly vacated or modified" by its decision and order.  Accordingly, we review not only the Commission's findings, but also the PULJ's findings to the extent that they were affirmed by the Commission and incorporated in the Commission's decision.

SmartEnergy contends there is not substantial evidence in the record to support the Commission's findings that: (1) its postcards were misleading; (2) its sales script was misleading; (3) it thwarted customers' attempts to cancel their enrollments; and (4) it failed

57

to adequately monitor sales calls as required by COMAR 20.59.10.04F. Finally, SmartEnergy argues that the Commission erred in failing to determine that the PULJ relied on improper selection bias in making her findings of fact.

### a. False and Misleading Postcards

As discussed above, the PULJ found that the mailing materials did not contain SmartEnergy's license number from February 2017 through July 2018 in violation of the applicable Choice Act regulations—a finding affirmed by the Commission. The Commission further found that, once SmartEnergy added the license number, it was placed on the last line at the bottom of the cards in a font significantly smaller than that used for the "FREE MONTH OF ELECTRICITY." The Commission found that SmartEnergy's supplier license number was not provided in a "conspicuous" manner as that term is defined by CL § 1-201(b)(10)[33] and, therefore, SmartEnergy violated COMAR 20.53.07.07B(1), which requires that a Maryland license number be included in a "clear and conspicuous

---

[33] CL § 1-201(b)(10) supplies the following definition of "conspicuous":

"Conspicuous", with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:

(i) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
(ii) Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

manner." The Commission also found that the postcards were deceptive in using the phrase "*as a [insert utility] customer . . .* you are eligible to receive one free month of electricity"—suggesting that the customer was eligible for the "free month" of electricity *because* they were a customer of their existing utility. (Emphasis added). The Commission further found that the language on the postcard implied that the offer was being made by the customer's utility company. Based upon our review of the record, including the postcards contained therein, the Commission's finding that the postcards were "deceptive and misleading" is supported by substantial evidence in the record as a whole.

We similarly agree with the Commission's finding that the postcards did not fall within the marketing materials exemption set forth in CL § 14-2202(a)(5). As discussed above, the Commission found that SmartEnergy designed the postcards to misleadingly appear to have been sent by the customers' utility. There is substantial evidence in the record to support this finding. We agree with the Division that, for the marketing materials exemption to apply, the postcard should identify who the real "merchant" is, and not mislead the customer that the merchant is someone else.

Additionally, the postcards fail to describe SmartEnergy's services, as required by CL § 14-2202(a)(5)(ii). We agree with the Division that the postcards failed to explain the basic facts that SmartEnergy is a third-party energy supplier selling electricity, and SmartEnergy was soliciting the consumer to switch energy suppliers from the consumer's existing utility to SmartEnergy. There is also substantial evidence in the record to support the Commission's finding that the postcard failed to provide any limitations or restrictions on SmartEnergy's offer of "free electricity," as required to satisfy CL § 14-2202(a)(5)(iii).

We agree with the Commission that the postcards failed to provide the length of service required to qualify or how the "free month" would be calculated and provided. To summarize, there is substantial evidence in the record as a whole to establish that SmartEnergy's postcards do not fall within the marketing materials exemption set forth in CL § 14-2202(a)(5).

### b. Misleading and Deceptive Sales Script

SmartEnergy next contends that the Commission erred in affirming the PULJ's finding that SmartEnergy's sales script had the capacity, tendency, or effect of deceiving or misleading customers, whether or not any customer was in fact misled, deceived, or damaged as a result of the agent following the script. To support this argument, SmartEnergy directs us to specific statements in its script, and argues that each isolated statement does not have the "capacity or tendency to mislead" and, therefore, the Commission's decision is lacking in substantial evidence.

For example, SmartEnergy contends that the Commission erred in finding that the script statement that the call may be monitored for training and quality purposes had the capacity, tendency, or effect of misleading customers because SmartEnergy asserts that it did, in fact, regularly listen to recorded calls for training and quality purposes. It further notes that the Choice Act regulations do not prevent the recordings from being used for dual purposes. While reading the statement in isolation may lead one to conclude that it is not misleading, when it is read in conjunction with other statements in the script—in the same manner that was undertaken by the PULJ and the Commission—there is substantial evidence in the record to support the Commission's findings. For example, the

60

Commission noted that in many instances, the agent began with the statement that the "call was being recorded for quality and training purposes" and, later in the call, would state, "now I'm going to place this call on a recorded line" or "do I have permission to record this call for quality and training purposes," immediately before asking the contract confirmation questions. Reading the script as a whole, there is substantial evidence in the record to support the Commission's finding that this portion of the script had the capacity or tendency to mislead customers into believing that the purpose of the recording was solely for quality or training purposes, rather than for purposes of verifying the caller's "yes" or "no" response to SmartEnergy's two-question confirmation questionnaire.

We reject SmartEnergy's invitation to analyze the Commission's findings by dissecting each scripted statement and reviewing it in isolation. Such an approach is inconsistent with our limited scope of judicial review, which requires that we determine whether factual findings are supported by "substantial evidence on *the record considered as a whole*." PU § 3-203(6) (emphasis added). Examining the Commission's findings pertaining to the script through the appropriate lens, we determine that the Commission's findings related to the script are supported by substantial evidence in the record as a whole.

SmartEnergy asserts that the Commission erred in affirming the PULJ's finding that SmartEnergy's use of the phrase "as a [utility name] customer . . . you are eligible to receive one free month of free electricity" when coupled with the promotional "price protection offer" pursuant to which agents told customers their rate would not change, caused customers to believe that they were dealing with their utility company, not an electricity supplier. SmartEnergy notes that the postcard "indicates" that SmartEnergy is not affiliated

61

with the utility company, and that because the script begins with "Thank you for calling SmartEnergy," there is no support for the conclusion that customers were potentially misled. We disagree.

As noted above, the Commission determined that the language on the postcard itself implied that the offer was being made by the customer's utility company. Indeed, our review of the postcards reveals that SmartEnergy made a reference to the customer's utility company as many as six times on the front and back of the postcard. The Commission further determined that, during its sales calls, SmartEnergy's agents did not reiterate the supplier's non-affiliation with "the" utility company. In addition to obscuring the lack of affiliation with the customer's utility company, SmartEnergy failed to affirmatively disclose that the customer would be leaving their current utility company.

The fact that the script had the tendency to mislead customers is borne out by the audio recordings that were produced. The Commission noted that in many of the audio recordings,

> customers were repeatedly confused by SmartEnergy's price protection (fixed rate) offer, many asking whether they were being asked to switch from their utility. In response, while [SmartEnergy] assured customers that they must in fact remain with their current utility in order to participate in SmartEnergy's price protection plan, the [s]upplier dodged the question of whether the customer was being asked to switch to a competitive electricity supplier.

The agents frequently used language such as "I do see here now that as a [utility] customer you are eligible" and "congratulations on your free month for being a [utility] valued customer," which the PULJ found, and the Commission affirmed, perpetuated the confusion regarding SmartEnergy's connection, or lack thereof, with the customer's utility

62

company.  For example, in one instance, a customer asked: "Is this one of those off companies because I don't want it if it's, if it's not a legitimate BGE company that I'm using right now," and the sales agent responded: "You will always continue to be a BGE customer."  That same customer later stated: "I'm not changing companies . . . so if that's what's up here, we need to stop."  The agent responded: "Like I said just continue making your payments to BGE as you always have."  In another scenario, in discerning whether the offer was a "legitimate" offer from the utility provider, the customer repeatedly stated that she was part of the "smart energy BGE program," and the agent simply responded "perfect" without any further clarification.

We similarly determine that there is substantial evidence in the record as a whole to support the Commission's decision affirming the PULJ's findings that the language in the script had the tendency to mislead customers into thinking that the price they were paying for electricity would not increase from the *current* rate.  Specifically, at the point in the script when the agent states that all utility services would remain the same and that the only difference would be that the price that the customer paid for electricity would be protected, the script did not include the disclosure of the rate that the customer would pay once they switched to SmartEnergy and the "price protection" period ended.  Rather, disclosure of the rate that the customer would pay to SmartEnergy only came during the "confirmation" questions at the conclusion of the call.  The Commission further determined that the portion of the script in which the agents were instructed to ask for the customer's account number to make sure that the price protection was applied to the correct account reinforced the implication that it was the customer's current rate that would be protected.

63

There is also substantial evidence in the record to support the Commission's affirmance of the PULJ's findings that SmartEnergy agents failed to always disclose that the restriction on the free month was based upon the customer's seventh month of SmartEnergy's retail supply, which the Commission determined to be a material term. The Commission noted that in the audio recordings produced, there were numerous instances in which—after the initial reference to "one month of free electricity"—there was no mention at all to the seven months of service requirement. The Commission determined that, in some instances, the agent only disclosed that the "free month of electricity" was provided in the form of a redemption coupon after the caller repeatedly asked for additional information about the free month.

Based upon our review of the script in this case—considered within the context of the postcards and audio recordings—there is substantial evidence in the record to support the Commission's findings that SmartEnergy's sales script had the capacity, tendency, or effect of deceiving or misleading customers, whether or not any customer was in fact misled, deceived, or damaged as a result of the agent following the script.

### c. Attempts to Thwart Customer Cancellations

SmartEnergy next contends that the Commission erred in affirming the PULJ's finding that it attempted to thwart customers' efforts to cancel their service. To support its argument, SmartEnergy asserts that it provided "extensive testimony" through its witness, Dehan Basnayake, concerning how it trains its agents to process cancellations and that it produced a "comprehensive set of policies" it utilizes to process cancellations. In considering this argument, the Commission noted that the OPC's witness, Susan M.

64

Baldwin, described in detail to the PULJ a number of instances in which the training that SmartEnergy argued it employed was not actually used by its sales agents. In affirming the PULJ's finding, the Commission noted that the PULJ credited Ms. Baldwin's testimony, and determined that it would "give deference to the PULJ as the initial factfinder in how to weigh the value and veracity of competing evidence." We apply the same deference in our evaluation of the evidence and, similarly, determine that the Commission's decision affirming the PULJ's finding is supported by substantial evidence.

### d. Failure to Adequately Monitor Sales Calls

SmartEnergy next argues that the Commission erred in affirming the PULJ's finding that it failed to adequately monitor telephonic sales calls in violation of the Choice Act regulations. In support of this argument, SmartEnergy asserts that the basis for the finding was a "small sample of call recordings" that do not account for the more than 104,000 interactions between SmartEnergy and Maryland consumers between February 2017 and May 2019. In affirming the PULJ, the Commission explained that the PULJ found recurring instances in which SmartEnergy's agents failed to provide accurate and complete information and failed to answer customers' questions. Based upon this evidence, the PULJ found that SmartEnergy failed to monitor the sales calls and, therefore, violated COMAR 20.53.08.04E. The Commission also noted that the audio recordings demonstrated a variety of "off-script" messages by agents that were crafted to deceive and mislead customers, which "further supports the PULJ's conclusion that SmartEnergy failed to monitor its sales calls as required." Based upon our review of the record, we determine that there is substantial evidence to support the Commission's finding.

65

*e. SmartEnergy's Selection Bias Argument*

We turn next to SmartEnergy's argument that the Commission erred in relying upon the expert testimony in this case from OPC's expert witness, Ms. Baldwin, and Commission Staff witness, Kevin Mosier. SmartEnergy contends that, in rendering their opinions, Ms. Baldwin and Mr. Mosier relied on a sample size of only 34 complaints (plus an additional 12 recordings provided by SmartEnergy) to support their conclusions that SmartEnergy provided deceptive and misleading information to more than 32,000 enrollees, out of a total of more than 104,000 calls, during the relevant time period. SmartEnergy notes that Ms. Baldwin admitted that the foundation of her testimony was her review of the 34 CAD complaints, as well as the audio files that SmartEnergy produced in discovery. SmartEnergy asserts that, based upon her review of these limited consumer interactions, Ms. Baldwin improperly drew a broader conclusion that "[i]t is highly likely that these practices were not limited to the consumers who later filed complaints with [CAD]—rather they appear to have been part of a pattern that would likely extend to all or most of the consumers with whom it had contact and eventually enrolled."

We hold that the Commission did not err in affirming the PULJ's dismissal of SmartEnergy's selection bias argument. First, the PULJ's finding that SmartEnergy engaged in a pattern or practice of systematic violations of the consumer protection provisions contained in the Choice Act and the Commission's regulations was not based solely upon Ms. Baldwin's testimony offered in connection with the CAD complaints. In rejecting what she considered to be SmartEnergy's "tenuous" selection bias argument, the PULJ commented on the fact that SmartEnergy's "telephone transactions were *based upon*

66

*the written script*," which she had found "had the capacity, tendency, or effect of deceiving or misleading consumers, and that SmartEnergy *used the script as an outline for all of its telephone transactions during the time period under investigation*."  (Emphasis added). The PULJ reiterated that the evidence in the record, "*including* the audio files of SmartEnergy's telephone transactions, SmartEnergy's script, as well as written and oral testimony, fully support[ed] the finding that, by and through its telephone transactions, SmartEnergy engaged in a pattern or practice of systematic violations of" the Choice Act and the Commission's regulations.  (Emphasis added).  Second, we agree with the Commission that, as an evidentiary matter, SmartEnergy was in possession of all 34,000 audio recordings from which OPC's and the Commission Staff's "sample" was taken, and that SmartEnergy had the ability—if it wished—to present an opposing sample for the PULJ's consideration.

### 4.  Whether the Commission's Remedies are Arbitrary or Capricious

Finally, SmartEnergy argues that the remedies imposed by the Commission are arbitrary or capricious.  In support of its argument, SmartEnergy contends that the Commission's remedies: (1) improperly penalize SmartEnergy for relying on three CAD form letters written in response to customer complaints, stating that SmartEnergy was not required to obtain written contracts for the electricity supply sales; (2) are "wildly inconsistent with Commission precedent involving suppliers that committed significantly more egregious conduct; and (3) fail entirely to consider SmartEnergy's remedial measures."

Before we turn to SmartEnergy's specific contentions, we note the considerable discretion that the General Assembly has conferred on the Commission when fashioning

67

remedies and penalties where it determines that an electricity supplier has violated Maryland's public utilities and consumer protection laws. Specifically, upon a finding of "just cause," the Commission may take various actions, including suspending or revoking the supplier's license, ordering a refund or credit to a customer, imposing a moratorium on adding or soliciting additional customers, and imposing a civil penalty or other remedy. PU § 7-507(k). "Just cause" is broadly defined to include, among other things, "engaging in deceptive practices[,]" or "violating a provision of [the Public Utilities Article] or any other applicable consumer protection law of the State." *Id.* § 7-507(k)(3). In its consideration of any civil penalty, the General Assembly instructs the Commission to consider: (1) the number of previous violations of the provisions of the Public Utilities Article; (2) the gravity of the current violation; and (3) the good faith of the electricity supplier to achieve compliance after notification of the violation. *Id.* § 7-507(l)(3). An agency's discretion in fashioning a sanction should only be overturned if the decision is arbitrary or capricious. *Md. Aviation Admin. v. Noland*, 386 Md. 556, 581 (2005). The arbitrary or capricious standard is "extremely deferential to the agency." *Md. Dep't of the Env. v. Assateague Coastal Trust*, 484 Md. 399, 449 (2023) (citations omitted).

As an initial matter, we note what is *not before the Court* at this juncture in the Commission's enforcement proceeding—the Commission has elected to defer "arguments regarding the possibility of license suspension and/or revocation of any civil monetary payment" until *after* SmartEnergy complies with the directives in its order. Accordingly, the amount of any civil monetary penalty is not before us.

68

Next, we turn to SmartEnergy's argument that the remedy imposed was unfair because SmartEnergy alleges that it relied on three CAD letters that were sent to customers who complained about SmartEnergy's business practices. In those three letters, CAD advised customers that the MTSA did not apply to the transactions. We are unpersuaded by SmartEnergy's argument for several reasons. First and foremost, it is "universally recognized" that a "State cannot be estopped by the acts and conduct of its officers or agents in the performance of" actions undertaken in its governmental capacity. *Salisbury Beauty Schools v. State Board of Cosmetologists*, 268 Md. 32, 64 (1973) (citations omitted). "The reason for the rule is obvious: no administrative officer is vested with the power to abrogate the statute law of the State, nor to grant to an individual an exemption from the general operation of the law." *Id.* (citations omitted). Second, the remedies imposed by the Commission do not solely arise from violations of the MTSA, but also relate to violations of the MCPA and the Choice Act, and the violations of those statutes are numerous. Third, neither the Commission nor CAD are charged with administering the MTSA—rather the Division is the agency with primary enforcement authority over the consumer protection laws set forth in Titles 13 and 14 of the Commercial Law Article. To the extent that any deference is owed to an agency's interpretation, it is to the Division's interpretation of the MTSA, and not the Commission's interpretation. Fourth, the CAD letters were form letters and were not the product of any reasoned rule-making process. Finally, SmartEnergy's purported reliance on the three CAD letters ignores the 24 CAD letters in the record that support the Commission's application of the MTSA to inbound calls.

With respect to the remedial directives set forth in the order, we observe that the Commission correctly recognized its authority to fashion various remedies under the Public Utilities Article. The Commission determined that the PULJ's findings were "supported by systemic violations by SmartEnergy of multiple statutes and regulations[,]" and noted that the PULJ found the violations of the Choice Act to be "egregious." Moreover, the Commission noted that the PULJ acknowledged that SmartEnergy took "prompt action to achieve compliance when it was relatively easy or inexpensive," such as adding its license number. However, the PULJ found that SmartEnergy did not address "more serious violations" until it began a "process of remediation in June 2019." The Commission incorporated by reference the PULJ's findings as part of its order.

In addition to the violations found by the PULJ, the Commission determined that the MTSA applied to the telephone transactions, and therefore, the contracts made pursuant to telephone solicitations were not valid and enforceable against the consumers without a written contract that complied with the requirements of the MTSA. In explaining its decision to require that SmartEnergy cancel all of its Maryland customer contracts on the basis that the contracts did not comply with the MTSA, the Commission cited to the remedies that it imposed in two prior administrative cases pending before it, stating "[w]here competitive retail suppliers have failed to comply with the MTSA's contracting requirements, the appropriate remedy has been cancellation of the supplier's Maryland

70

invalid customer enrollments and requiring those customers to be returned to utility standard offer service." [34]

Based upon our review of this record, we determine that the remedies imposed by the Commission in this case are within its statutory discretion and are not arbitrary or capricious. The Commission had just cause to order that partial refunds be issued and customers be returned to their prior utility's standard offer service based upon its multiple findings, as described more fully above, that SmartEnergy (1) unlawfully enrolled customers, (2) engaged in deceptive trade practices, (3) violated the Commission's regulations, and (4) violated Maryland consumer protection laws. [35]

---

[34] Based upon our review of the record, as well as the enforcement cases cited in the Commission's decision, and in the appendix to the Commission's brief, the penalties imposed by the Commission—including ordering customer refunds and requiring the supplier to return Maryland customers to the utility's standard offer service—are consistent with the penalties imposed in other administrative proceedings. *See, e.g., Complaint of the Maryland Office of People's Counsel against SunSea Energy, LLC*, Public Service Comm'n, Case No. 9647 (directing the supplier to return customers to the utility's standard offer service and issue a refund to the customers for the difference between the rate charged and the standard offer service).

[35] In this case, the PULJ recommended that the Commission enter an order requiring that SmartEnergy cancel its existing customer enrollments in Maryland and return the customers to their utility standard offer service *unless* the customers take affirmative action to remain with SmartEnergy. In rejecting this specific recommendation, the Commission stated:

> Having reversed the PULJ regarding the applicability of the MTSA and finding SmartEnergy's contracts with its Maryland customers invalid due to SmartEnergy's failure to comply with the MTSA contracting requirements, the opt-in proposal recommended by the PULJ allowing SmartEnergy to perfect contracts with its Maryland customers solicited via telephone is therefore moot.

71

# IV

## Conclusion

For the reasons set forth above, we hold:

1. Under the plain language of the Choice Act, the General Assembly has granted the Commission the express authority to determine whether electricity suppliers under its jurisdiction have violated Maryland's consumer protection laws, including the MTSA, and to impose statutory remedies where it determines that the supplier has violated any applicable consumer protection laws of this State.

2. The Commission correctly concluded that the MTSA applies to SmartEnergy's business practices. The MTSA applies to sales made over the telephone where the consumer places the telephone call to the merchant in response to a merchant's marketing materials unless the transaction falls within one of the statutory exemptions outlined in CL § 14-2202.

---

In dismissing the PULJ's recommendation on the ground of "mootness," the Commission appears to have concluded that, because the MTSA applies, the contracts are void. During oral argument, there were questions from the Court concerning whether a contract made in violation of the MTSA is void or voidable by the consumer under the plain language of the statute. *See* CL § 14-2203(a) (stating that "[a] contract made pursuant to a telephone solicitation is not valid and enforceable against a consumer unless made in compliance with this subtitle"). This issue was not raised in the parties' briefs. Accordingly, this Court will not decide it. Moreover, we also note that the Commission's finding that SmartEnergy's false and deceptive marketing practices violated statutory and regulatory provisions that were separate and apart from the MTSA violations provided an independent basis for the Commission's remedies, regardless of the legal interpretation of the MTSA raised in this footnote.

3. The Commission's affirmance of the PULJ's findings of fact that SmartEnergy's business practices violated the Choice Act and the Commission's regulations, and its additional findings of fact that SmartEnergy's business practices violated the MTSA, was supported by substantial evidence in the record.

4. The remedies imposed by the Commission in its final order arising from SmartEnergy's violation of Maryland laws were within its discretion and were not arbitrary or capricious.

**JUDGMENT OF THE APPELLATE COURT AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.**

Circuit Court for Montgomery County
Case No. 485338V
Argued: September 7, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 1

September Term, 2023
_____

IN THE MATTER OF SMART ENERGY

HOLDINGS, LLC D/B/A SMARTENERGY
_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.
_____

Dissenting and Concurring Opinion by
Gould, J.
_____

Filed: February 22, 2024

I join in part, concur in part, and dissent in part with the Majority's well-written opinion.[1] I concur with the Majority that the definition of "telephone solicitation" under the Maryland Telephone Solicitations Act ("MTSA") could include calls made by consumers to merchants that are prompted by a direct mail piece or other type of advertisement. However, I disagree with certain aspects of the Majority's analysis of this issue. Specifically, in my view, we should hold the following: (1) a telephone call from a consumer is not a "telephone solicitation" under the MTSA if the direct mail piece that prompted the call was part of the merchant's attempt to sell, as opposed to, for example, a hook designed *only* to get the consumer to place the call; (2) because the Commission found that the postcards were part of SmartEnergy's attempt to sell its services, its attempts to sell were *not* entirely by telephone, thus, the resulting transactions were not made pursuant to "telephone solicitations" under the MTSA; and (3) therefore, the Commission's finding of liability under the MTSA should be reversed.

I dissent from the Majority's disposition of the MTSA claim for another reason. In my view, the Majority too easily dismisses the significance of the written communications from the Commission's Consumer Affairs Division ("CAD") to SmartEnergy stating that the MTSA does not apply to inbound calls. The Commission made those representations three times over the course of 18 months in response to specific consumer complaints and, more importantly, pursuant to regulations the Commission promulgated. I agree with the Majority that the Commission is not estopped from changing its position, particularly when

_____

[1] Unless defined otherwise, all capitalized terms shall have the same definitions as set forth in the Majority's Opinion.

doing so corrects a prior error of law. But here, its retroactive application of its changed position vis-à-vis SmartEnergy was arbitrary and capricious, and because of that, either: (1) the Commission's finding of liability under the MTSA should be reversed; or (2) a remand is warranted for the Commission to reconsider the penalty with due consideration given to its changed position.

Finally, I disagree with the Majority that a finding of a pattern and practice of deceptive or misleading conduct can be based in whole or in part on conclusions drawn from the recordings or transcripts from telephone conversations with the 34 customers who filed complaints with the Commission. The Commission's findings of liability under Md. Code Ann., Pub. Util. ("PU") § 7-505(b)(7) (1998, 2020 Repl. Vol.), Md. Code Ann., Com. Law ("CL") § 14-2203(b) (1975, 2013 Repl. Vol.), CL §§ 13-301(1), (3), and § 13-303, COMAR 20.53.07.07A(2), and COMAR 20.53.08.04E,[2] were tainted by that extrapolation. I would, therefore, remand the matter to the Commission to reconsider its finding of liability on those claims without relying on extrapolations from those 34 calls.

## I

This case involves the interplay between three specific provisions of the MTSA: (1) the contract requirements under CL § 14-2203 for sales made "pursuant to a telephone solicitation"; (2) the definition of "telephone solicitation" under CL § 14-2201(f); and (3) the exemption from the MTSA under CL § 14-2202(a)(5). Construing these provisions together, the Majority holds that there is

---

[2] As of March 2022, this provision was recodified as COMAR 20.53.10.04F.

2

only one logical reasonable interpretation—the MTSA applies when a consumer receives advertising materials, reviews them, places a call to the merchant, and the merchant then makes a sale of goods in response to the customer's call, *unless* the marketing materials contain the information required in CL § 14-2202(a)(5)(i) through (iii).

Maj. Op. at 51. The Majority then dismisses as "hard to imagine" and "illogical" the possibility that the exemption under CL § 14-2202(a)(5) could ever apply when a merchant initiates a telephone call to the consumer. Maj. Op. at 52.

Although I disagree with how the Majority construes the exemption under CL § 14-2202(a)(5), I agree with the central tenet of the Majority's holding—that the statutory definition of "telephone solicitation" could include calls made by consumers prompted by direct mail or other advertisements. Section 14-2201(f) states that "'[t]elephone solicitation' means the attempt by a merchant to sell or lease consumer goods, services, or realty to a consumer located in this State that is: (1) Made entirely by telephone; and (2) Initiated by the merchant." Although written in the passive voice, from a grammatical standpoint, this definition is not difficult to parse. A "telephone solicitation" is, first and foremost, a *merchant's* attempt to make a sale, not a *consumer's* attempt to make a purchase. Further, it's a sales *attempt* that must fulfill two criteria. First, the attempt to sell must be "[m]ade entirely by telephone"; and second, the attempt to sell must be "[i]nitiated by the merchant." *Id.*

Sometimes this definition is easy to apply. If a merchant cold calls a consumer and attempts to sell its service during that call, that sales attempt would be a telephone solicitation and, unless one of CL § 14-2202's exemptions applies, a resulting transaction would be subject to the MTSA's contract requirements. On the other hand, when a

3

consumer calls the local pizza joint and places a carry-out order, calls a plumber to unclog a shower drain, or calls a bike shop to order parts, such transactions result from a *consumer-initiated* attempt to *buy*, not from a *merchant-initiated* attempt to *sell*. Because those calls are not "telephone solicitations," the resulting transactions are not subject to the MTSA's contract requirements.

Companies have long deployed one or more strategies—e.g., direct mail, cold-calling, print media advertising, online advertising, social media, etc.—independently or in conjunction with one another, in various sequences, and for various purposes. Some ads are designed to create only brand awareness, so that although the consumer may not be interested or in need of a consumer good or service today, the consumer will know who to call when and if the need arises. Some ads are designed to arouse the consumer's appetite or interest in consuming a product or service, either consciously or subconsciously. Others are designed to serve as a hook to put the consumer in the presence of the seller, literally or figuratively, at which time the seller commences its sales pitch. The ways in which merchants attempt to reach consumers are many and varied.

Application of the MTSA's definition of "telephone solicitation" gets complicated when a merchant pairs a telemarketing strategy with other advertising methods. Here, SmartEnergy used a direct mail piece inviting the consumer to call. SmartEnergy urges us to adopt a bright line rule that excludes from the definition of "telephone solicitation" the resulting inbound telephone calls. I agree with the Majority's rejection of this interpretation. As discussed above, whether a sales attempt satisfies the MTSA's definition of "telephone solicitation" does not hinge on who places the call, but rather on whether the

4

merchant initiated an attempt to sell or the consumer initiated an attempt to buy; and if it's the former, *when* and *how* the merchant's attempt to make the sale began and ended. The merchant's attempt to sell qualifies as a "telephone solicitation" only if its *entire* attempt to sell took place during the telephone call.

For an extreme example to see how an inbound call could be a "telephone solicitation," suppose a seller of nutritional supplements mails postcards to consumers that say only "Call This Number: xxx-xxx-xxxx. You'll be glad you did." No merchant is identified, and no product or service is mentioned. The only discernable purpose of the postcard would be to arouse the consumer's curiosity enough to pick up the phone and make the call. In that situation, the consumer placing the call is as much in the dark about the purpose of the call as the consumer who receives a cold call. Because the merchant's attempt to sell its products begins and ends during the telephone call, this would constitute a telephone solicitation, notwithstanding that the consumer made the call.

Here, a plausible argument could certainly be made that SmartEnergy's postcards were not part of the sales attempt, but rather served only as a hook to get the consumer to call SmartEnergy. In my view, however, the Commission found to the contrary. Specifically, the Commission found that, "[i]n this instance, it is clear that SmartEnergy initiated the attempt to sell its retail supply product to customers by sending the postcard to the customer." *See* Comm'n Order at 30. Indeed, the Commission found that the substance of the postcards was part of the sales attempt is reflected in the Commission's concern about the misleading nature of the postcard. The Commission wrote:

5

In finding that the sales attempt was initiated by the merchant, the Commission notes that SmartEnergy solicited the customers' calls using a postcard deceptively (1) using the phrase "as a [utility] customer . . . you are **eligible to receive one free month of electricity,"** (2) implying that the offer was being made by the customer's current utility, greeting customers with offering "free" electricity with phrases such as "yes, I see that as a [utility] customer, you are eligible to receive one free month of electricity," reinforcing the implication that the customer is dealing with his or her current utility, (3) assisting and often times coaching customers through customer service calls with the customer's utility to obtain the customer choice identification number needed by the Supplier in order to enroll the customer with SmartEnergy, and (4) suggesting electricity rates in an upcoming season will likely fluctuate, adding that what SmartEnergy is offering will give the customer **"peace of mind."**

Comm'n Order at 33.

Thus, because the Commission found that the postcard was part of SmartEnergy's sales attempt, it logically follows that the sales attempt was not *entirely* by telephone. For that reason alone, I would reverse as legally incorrect the Commission's finding of liability under the MTSA.[3]

In my view, whether an advertisement is part of the merchant's sale's attempt should be determined on a case-by-case basis, considering the specific facts and circumstances, unless, of course, the advertisement falls within one of the exempted categories under CL § 14-2202(a). In relevant part, CL § 14-2202(a) states:

The provisions of this subtitle do not apply to a transaction:

. . .

---

[3] The MTSA does not mention or allude to deceptive trade practices, which makes sense given: (1) as the Majority observes, deceptive sales practices are prohibited elsewhere in the Consumer Protection Act and the Choice Act, Maj. Op. at 4, 7-8; and (2) the unique problems with telephone solicitations that animated the General Assembly to enact the MTSA. *See* Maj. Op. at 54 n.32. (summarizing legislative history).

6

(5) In which the consumer purchases goods or services pursuant to an examination of a television, radio, or print advertisement or a sample, brochure, catalogue, or other mailing material of the merchant that contains:
     (i) The name, address, and telephone number of the merchant;
     (ii) A description of the good or services being sold; and
     (iii)Any limitations or restrictions that apply to the offer[.]

The Majority appears to create a bright-line rule that direct mail advertisements are part of the attempt to sell—and therefore telephone calls prompted by such ads are not "telephone solicitations"—only if the ad contains all the information set forth in CL § 14-2202(a)(5). I disagree. CL § 14-2202(a) does not qualify, limit, or expand the definition of "telephone solicitation" under CL § 14-2201(f). The General Assembly could have drafted the statute to include in the definition of "telephone solicitation" all inbound calls except those made in response to advertisements containing the information identified in CL § 14-2202(a)(5). But it didn't.

CL § 14-2202(a)(5) does not specify the minimum information needed for an advertisement to take the resulting inbound call outside the definition of "telephone solicitation," but instead serves only as a safe harbor for those advertisements that include such information. Notably, the introductory phrase in CL § 14-2202(a) states that "[t]he provisions of [the MTSA] ***do not apply***" (emphasis added) to the five enumerated transactions under subsections (1) through (6). Thus, if one of the exemptions under CL § 14-2202 applies, then *none* of the MTSA's other provisions apply, including the definition of "telephone solicitation" under CL § 14-2201(f). Put simply, if a direct mail piece is exempt under CL § 14-2202(a)(5), the seller gets the benefit of the safe harbor,

7

and the inquiry is over. You don't even reach the question of whether the definition of "telephone solicitation" was met.

But if the direct mail piece is *not* exempt under CL § 14-2202(a)(5), then the inquiry under the MTSA begins, starting with the definition of "telephone solicitation." To illustrate the point, assume that the postcard advertisement includes every piece of information necessary under CL § 14-2202(a)(5) to qualify for the exemption save one—the merchant's address. Under the Majority's formulation, the exemption would not apply; thus, the definition of "telephone solicitation" would automatically be met.

But what if the postcard contains a significant amount of *other* information, including information not required to meet the exemption but would be required in a written contract under CL § 14-2203. For example, suppose the direct mail piece had a "*detailed* description of the goods or services being sold,"[4] as well as the price of the product or service, both of which are required in CL § 14-2203's contract requirements, but not required under the exemption. (Emphasis added). Suppose also that it had the merchant's email and website addresses—also not required under the exemption—from which the mailing address could easily be ascertained. In this scenario, although the exemption does not apply due to the missing address, neither the plain language nor the structure of the statute mandates the conclusion that the postcard was not part of the merchant's attempt to sell or that the resulting telephone call is a "telephone solicitation."

---

[4] Notably, the exemption under CL § 14-2202(a)(5)(ii) requires a "description" of the product or service, not a "detailed" description as required in the written contract under CL § 14-2203(b)(4).

8

To the extent that the Majority's opinion stands for such a proposition, I respectfully dissent on that basis as well.[5]

## II

Here, before ultimately reversing itself and finding liability under the MTSA, on three separate occasions, CAD represented in letters to SmartEnergy and to complaining consumers that the consumer's calls to SmartEnergy were not covered by the MTSA. This does not present an issue of estoppel; I agree with the Majority that the Commission can and should change its policy when it discovers its previous policy was legally untenable. But, consistent with its obligation not to make arbitrary and capricious rulings, *see* PU § 3-203, the Commission should not apply such changed positions retroactively to those companies that developed or maintained practices based on the Commission's prior interpretations.

Before discussing the three CAD letters, it is helpful to understand the regulatory context in which they were issued. Under the Commission's regulations, an "[i]nquiry" is defined as a "written or oral communication used by a customer to request review of a dispute." COMAR 20.32.01.02B(7). A customer may submit an inquiry involving a supplier to the Commission if the parties cannot privately resolve their dispute. *See* COMAR 20.32.01.03A (requiring the customer to first submit an inquiry directly to a

---

[5] Similarly, to the extent the Majority forecloses the possibility that an outbound call by the merchant could trigger an exemption under CL § 14-2202(a)(5), I disagree. It is not uncommon, at least in my experience, to receive a direct mail piece *and* a telephone call from a merchant, in that sequence. I think the Majority is getting over its skis by seemingly foreclosing that possibility.

"utility, supplier, or a subscriber organization for resolution"); COMAR 20.32.01.04A, B (allowing a customer to submit an inquiry to the Commission if the customer disputes the determination of the utility, supplier, or subscriber organization). The Commission or its staff may then refer the inquiry to CAD. COMAR 20.32.01.04C. CAD may also receive an inquiry directly from a customer. *Id.*

Upon receiving an inquiry, CAD is required to review and investigate the matter. COMAR 20.32.01.04F. This "includes but is not limited to" obtaining information from the supplier and customer, "[r]eviewing applicable statutes, regulations, and tariffs[,]" and mediating between the supplier and customer. *Id.* CAD must close its investigation "in writing" if (a) it "determines that no further investigation is necessary or warranted;" (b) it "determines that the Commission has no jurisdiction to pursue an investigation;" (c) "[a] satisfactory resolution to the inquiry is reached;" or (d) "[a]ny reason" requires closure of the investigation. COMAR 20.32.01.04C(3).

On completion of its investigation, CAD must provide the supplier and customer "with a written summary of its findings and conclusions[.]" COMAR 20.32.01.04J. Furthermore, "[i]f CAD believes that a dispute or inquiry has been satisfactorily resolved," it must notify the parties that "no further action will be taken" and that "the file will be closed" unless a request for further review is submitted to CAD's Assistant Director. COMAR 20.32.01.04K, L. Any disposition issued by CAD's Assistant Director may then be appealed to the Commission. COMAR 20.32.01.04M.

Consistent with these regulations, CAD sent three letters to SmartEnergy, with a copy of each letter to the complaining customer. In each letter, CAD explicitly stated that

10

the MTSA's requirements do not apply to situations where the customer initiates the call to enroll with an electricity supplier. None of the three letters were appealed.

In the first letter, dated February 28, 2018, CAD stated:

Based on the information provided, I am unable to determine that this was an unauthorized enrollment based on the recording and based on COMAR 20.53.07.08 C(4)[] covering Method of Enrollments for Telephone Contracts. *A supplier is not required to obtain a wet signature for telephone contracts where the Customer of Record has initiated the call to the supplier to enroll in the supplier's services. . . .*

(Emphasis added). In the second letter, dated May 15, 2019, CAD stated:

Telephone solicitation is defined under state law as "the attempt by a merchant to sell or lease consumer goods, services, or realty to a consumer located in this State that is: (1) Made entirely by telephone; and (2) Initiated by the merchant." *No documentation has provided* [sic] *that would contradict Smart Energy's response of the inbound call be made by the customer, which is not considered telephone solicitation*; the burden of proof is the responsibility of the customer.

(Emphasis added). Finally, in the third letter, dated July 9, 2019, CAD stated:

After carefully considering this matter, and reviewing the regulations, it has been determined that your phoned-in enrollment was valid. *A wet signature is not required when the enrollment was initiated by you.* You called SmartEnergy to sign up in SmartEnergy's 6 month fixed product for 9.50 cent/kWh with a "free month" after your 6 month period. *SmartEnergy is exempt from obtaining a wet signature to complete the enrollment under the Maryland Telephone Solicitations Act.*

(Emphasis added).

The Commission sent these three letters over the course of 18 months. In fact, the last letter was sent *after* the Commission Staff filed the complaint against SmartEnergy that ultimately resulted in the Commission's Order. Thus, in my view, the Commission's departure from the precedent it established with SmartEnergy was arbitrary and capricious.

11

*Harvey v. Marshall*, 389 Md. 243, 303 (2005) (An agency action may be arbitrary and capricious if the action is "irrationally inconsistent with previous agency decisions.").[6]

In *Montgomery County v. Anatasi*, the Court held that a promotion board for police department members acted arbitrarily and capriciously when it deviated from policies that the board had adopted for itself in a prior case. 77 Md. App. 126, 137-39 (1988). There, the board deviated from its established policies regarding consultations with persons not on the board and subsequently failed to provide an adequate explanation for this deviation. *Id.* The Court stated that "courts . . . must scrutinize inconsistent administrative decisions to insure that the decisions represent an intentional change and not merely evidence of arbitrary and capricious enforcement." *Id.* at 138.

Similarly, in *Frederick Classical Charter School, Inc. v. Frederick Cnty. Bd. of Educ.*, this Court held that the State Board of Education's denial of certain funds to a charter school was arbitrary and capricious because the decision departed from the State Board's own precedent in a prior case. 454 Md. 330, 412 (2017). The Court stated that "when an agency changes a position clearly established in its own prior precedent it 'must supply a reasoned analysis indicating that prior policies and standards are being deliberately

---

[6] Although *Harvey v. Marshall* involved judicial review under the Administrative Procedure Act ("APA"), as the Majority correctly notes, the standard of review for Commission decisions under PU § 3-203 is consistent with the standard of review under the APA—with the caveat that PU § 3-203 sometimes requires heightened deference to Commission decisions. Maj. Op. at 38 n.28; *Md. Off. of People's Couns. v. Md. Pub. Serv. Comm'n*, 461 Md. 380, 392-93 (2018). But, as the Majority points out, the deference afforded to the Commission under PU § 3-203 is not applicable to its interpretation of the MTSA. Thus, cases addressing whether an agency action is "arbitrary and capricious" under the APA are instructive in determining whether the Commission's change of position here was arbitrary and capricious.

changed, not casually ignored.'" *Id.* at 407 (quoting *Anastasi*, 77 Md. App. at 137). Although the Court in *Frederick Classical* was interpreting an agency regulation rather than the APA, it applied the same rationale used in *Anastasi*. *See id.* at 372-73.

Just like *Anastasi* and *Frederick Classical*, this case involves an agency acting inconsistently with previous positions. In fact, the inconsistencies here could be considered more problematic than those at issue in *Anastasi* and *Frederick Classical*. In those cases, there was no indication that the challenged agency decisions and prior agency decisions involved the *same* outside party. *See Anastasi*, 77 Md. App. at 137-39; *Frederick Classical*, 454 Md. at 412. Here, the original and changed positions were applied to the same party. Companies doing business in Maryland reasonably expect not to be whipsawed in such an arbitrary manner.

The Majority dismisses the three CAD letters as "form letters [that] were not the product of any reasoned rule-making process." Maj. Op. at 70. To the contrary, each of the three letters addressed and resolved specific consumer complaints. The letters were, by their own terms, prepared by CAD after evaluating the consumer's complaint, SmartEnergy's conduct, and the applicable law. They were not off-the-cuff, casual statements by Commission employees. And although CAD is not a rulemaking body and thus the letters do not carry the same force as duly promulgated rules, the letters were the product of the process mandated by the Commission's duly promulgated rules.[7] The significance of these letters, therefore, should not be so casually dismissed.

---

[7] Besides, an agency action can be "arbitrary and capricious" even if it occurs outside the rulemaking process. Such was the case in *Anastasi*, where the action at issue

13

The Majority contends that SmartEnergy inappropriately focuses on these three letters while "ignor[ing] the 24 CAD letters in the record that support the Commission's application of the MTSA to inbound calls." *Id.* at 69. As an initial matter, SmartEnergy did not "ignore" the 24 CAD letters—it specifically addressed them in its Reply Brief to this Court. More importantly, however, the 24 letters do not indicate that the Commission believed the MTSA was applicable to inbound calls. With one exception, the 24 letters were form letters that contained identical language, informing SmartEnergy that "[i]f solicitation was done by telephone," it needed to provide a copy of the third party verification."[8] Unlike the three CAD letters discussed above, these 24 CAD letters were not final Commission decisions and communicated nothing to SmartEnergy about whether CAD believed the MTSA applied to SmartEnergy's conduct.[9]

Because the Commission's unexplained change of position was, in my view, arbitrary and capricious, I would reverse. In the alternative, in determining the penalty, the

---

was the decision of a promotion board in a context outside the rulemaking process. *See* 77 Md. App. at 137-39. Likewise, the action at issue in *Frederick Classical* did not involve the rulemaking process, but instead was a State Board of Education decision to deny funds to a charter school. *See* 454 Md. at 412.

[8] These letters stated: "[i]f solicitation was done by telephone, provide copy of the Third Party Verification (TPV) pursuant to [applicable regulations]. However, you should note that if you provide a TPV, a SIGNED CONTRACT with a wet signature is also required unless you can show that you are exempted from the [MTSA]."

[9] The one letter of the 24 that was not a form letter did not address inbound calls. Moreover, after that letter was sent, SmartEnergy informed the Commission that SmartEnergy believed a signed contract was not required based on information available on the Commission's website. I found nothing in the record indicating that the Commission disabused SmartEnergy of this interpretation.

Commission should have taken into consideration its changed position. Thus, at a bare minimum, a remand is warranted.

## III

SmartEnergy's direct mail campaign generated just over 104,000 calls from potential consumers, of which approximately 32,000 turned into enrollments. Of those 32,000 customers, 34 filed complaints with the Commission. The record before the Commission included the recordings of the calls with the 34 complainants.[10] Based at least in part on these 34 recordings, the Commission concluded that SmartEnergy engaged in "systemic" violations of Maryland law and exhibited a "pattern" of unlawful conduct. Thus, the Commission premised findings of systemic misconduct, at least in part, on only 0.033% of all the calls generated by the postcards, and only 0.106% of the calls that were converted into enrollments.

This miniscule sample size was not the only problem with the Commission's reliance on these calls. Each of these calls was with a customer who felt strongly enough to file a complaint with the Commission. In my view, as a matter of basic common sense, when a merchant has 104,000 telephone calls with potential customers in response to a postcard advertisement, 32,000 of which were converted into sales, reliable conclusions about systemic misconduct cannot reasonably be drawn from the calls with the only customers—34 in total—that lodged complaints. Moreover, it is irrelevant that

---

[10] In discovery, SmartEnergy produced recordings or transcripts of 12 other calls with customers, but there is no indication that either the public utility law judge or the Commission relied on those 12 calls in reaching their conclusions.

15

SmartEnergy possessed all the recordings and could have introduced them into evidence for the Commission's consideration. Maj. Op. at 67-68. It was the Commission's burden to prove the alleged violations, not SmartEnergy's burden to disprove them. *See Brehm v. Lorenz*, 206 Md. 500, 506 (1955).

The Majority also contends that the public utility law judge's finding of a "pattern or practice of systematic violations"—which was affirmed by the Commission—was not based solely on the small sample of calls, but also on SmartEnergy's written script for such calls during the relevant period. Maj. Op. at 67-68. That may be so, but it doesn't remove the taint from the Commission's reliance on the unrepresentative sample of recordings. I would, therefore, remand this case to the Commission to reconsider its liability findings under PU § 7-505(b)(7), CL § 14-2203(b), CL §§ 13-301(1), (3) and 13-303, COMAR 20.53.07.07A(2), and COMAR 20.53.08.04E, without relying on extrapolations from the 34 phone calls.[11]

---

[11] In its Order, the Commission found that SmartEnergy committed several non-MTSA violations without relying on extrapolations from the 34 calls. Specifically, the Commission found that SmartEnergy violated COMAR 20.53.07.08B(1) (requiring suppliers to provide contract summaries to customers); COMAR 20.53.07.08C(1) (prohibiting a supplier from enrolling a customer using a process that does not require the customer's affirmative confirmation); COMAR 20.53.07.05A (prohibiting a supplier from enrolling a customer without the customer's consent); COMAR 20.61.04.01B (requiring the inclusion of certain statements in a contract for the sale of electricity marketed as renewable); COMAR 20.61.04.01C (requiring a dollar amount to be included on the statements required by COMAR 20.61.04.01B); and COMAR 20.53.07.07B(1) (requiring that the supplier's license number be conspicuously listed on the supplier's marketing or solicitation materials). I do not suggest that these findings should be disturbed. Moreover, I do not take issue with the findings specific to the 34 calls, only with the findings based on extrapolations from those calls.

Accordingly, for the foregoing reasons, I concur in part and dissent in part. In all other respects, I join the Majority's opinion.